**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MICHAEL ANDREW,

*Plaintiff-Appellant,*

v.

KEVIN P. CLARK (In his personal capacity); LEONARD HAMM, Baltimore Police Commissioner (In his personal and official capacity); BALTIMORE POLICE DEPARTMENT; KENNETH BLACKWELL, Deputy Police Commissioner,

*Defendants-Appellees.*

⎫
⎬ No. 07-1184
⎭

NATIONAL FRATERNAL ORDER OF POLICE; NATIONAL EMPLOYMENT LAWYERS ASSOCIATION; PUBLIC CITIZEN, INC.; THE AMERICAN CIVIL LIBERTIES UNION OF MARYLAND; GOVERNMENT ACCOUNTABILITY PROJECT; REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS,

*Amici Supporting Appellant.*

MICHAEL ANDREW,

　　　　　　　　*Plaintiff-Appellant,*

　　　　　　　　v.

KEVIN P. CLARK (In his personal
capacity); LEONARD HAMM,
Baltimore Police Commissioner
(In his personal and official
capacity); BALTIMORE POLICE
DEPARTMENT; KENNETH BLACKWELL,
Deputy Police Commissioner,

　　　　　　　　*Defendants-Appellees.*　　　　No. 07-1247

NATIONAL FRATERNAL ORDER OF
POLICE; NATIONAL EMPLOYMENT
LAWYERS ASSOCIATION; PUBLIC
CITIZEN, INC.; THE AMERICAN CIVIL
LIBERTIES UNION OF MARYLAND;
GOVERNMENT ACCOUNTABILITY
PROJECT; REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS,

　　　　　*Amici Supporting Appellant.*

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(1:04-cv-03772-AMD)

Argued: January 27, 2009

Decided: April 2, 2009

Before WILLIAMS, Chief Judge, WILKINSON, Circuit Judge, and Arthur L. ALARCÓN, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

---

Vacated and remanded in part and affirmed in part by published opinion. Senior Judge Alarcón wrote the opinion, in which Chief Judge Williams joined. Judge Wilkinson wrote a separate concurring opinion.

---

## COUNSEL

**ARGUED:** Howard Benjamin Hoffman, Rockville, Maryland, for Appellant. Bonnie Ilene Robin-Vergeer, PUBLIC CITIZEN LITIGATION GROUP, Washington, D.C., for Amici Supporting Appellant. William Rowe Phelan, Jr., BALTIMORE CITY DEPARTMENT OF LAW, Baltimore, Maryland, for Appellees. **ON BRIEF:** Karen Stakem Hornig, Chief Legal Counsel, Office of Legal Affairs, BALTIMORE POLICE DEPARTMENT, Baltimore, Maryland; George A. Nilson, City Solicitor, BALTIMORE CITY DEPARTMENT OF LAW, Baltimore, Maryland, for Appellees. Larry H. James, Christina L. Corl, Lindsay L. Ford, CRABBE, BROWN & JAMES, L.L.P., Columbus, Ohio, for National Fraternal Order of Police, Amicus Supporting Appellant.

---

## OPINION

ALARCÓN, Senior Circuit Judge:

Michael Andrew appeals from the district court's order granting the Defendants' motion to dismiss this 42 U.S.C. § 1983 civil rights action for failure to state a claim pursuant

to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Andrew named as defendants two former Baltimore Police Department ("BPD") police commissioners and a BPD deputy police commissioner. Andrew contends that the district court erred in determining that the allegations in his complaint did not demonstrate that the Defendants violated his First Amendment right to freedom of speech by retaliating against him for releasing an internal memorandum ("Andrew Memorandum") to a reporter for the *Baltimore Sun*. In his memorandum, Andrew requested that an investigation be conducted to determine whether the use of deadly force by a tactical unit of the BPD against a barricaded suspect was justified and properly conducted. Andrew argues that the retaliation was improper because as a citizen, he has a First Amendment right to speak about a matter of public concern. The district court concluded that Andrew's Memorandum was not protected by the First Amendment under *Garcetti v. Ceballos*, 547 U.S. 410 (2006), because it "never lost its character as speech pursuant to his official duties simply by virtue of the wider dissemination he elected to give it after his recommendations were ignored by the police commissioner." *Andrew v. Clark*, 472 F. Supp. 2d 659, 662 n.4 (D. Md. 2007).

We vacate the district court's order dismissing this action and remand for further proceedings because Andrew has alleged facts in his second amended complaint that could entitle him to relief on his First Amendment claims. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007) ("[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.").

For the reasons discussed below, we also hold that the district court erred in dismissing Andrew's petition and procedural due process claims. We affirm the denial of Andrew's motion for partial summary judgment, and the denial of his motion for fees and costs incurred in effectuating service on Defendant Kevin P. Clark.

# I

Because the district court dismissed this action pursuant to Rule 12(b)(6), we treat each of the allegations in the second amended complaint as true. *See Boring v. Buncombe County Bd. of Educ.*, 136 F.3d 364, 367 (4th Cir. 1998) ("We review a dismissal for failure to state a claim *de novo*, drawing all reasonable inferences in favor of the plaintiff and accepting the allegations that are stated in the complaint as true.").

Andrew was employed by the Baltimore Police Department from June 1973 until his employment was terminated in September 2004. At the time of his termination, Andrew served as a Major, a command level rank.

On or about December 8, 2003, an elderly man named Cephus Smith killed his landlord over a rent increase and barricaded himself in his apartment. Andrew was the commander of the Eastern District of the BPD and responded to the barricade situation. There were four commanders at the scene of the barricade. The senior officer was Colonel Carl Gutberlet. Andrew's only duty at the crime scene was to supervise the officers assigned to perimeter street control. Andrew requested that a Technical Assistance Response Unit ("TARU") look inside the suspect's apartment to gain additional intelligence. He also instructed the BPD officers to continue their attempts to negotiate with the suspect. TARU officers under the command of another BPD official arrived at the scene. The unit entered the suspect's apartment and shot and killed the suspect (the "Smith shooting").

Following the Smith shooting, Andrew repeatedly asked that the BPD include him in a review and investigation of the shooting given the fact that there were no hostages and no evidence that the suspect intended to commit further violence from within his apartment. Despite his requests, Andrew was not included in any BPD investigation of the Smith shooting.

On December 17, 2003, Andrew submitted his memorandum to Defendant Kevin P. Clark, the former police commissioner of the BPD, in which Andrew expressed his concern regarding whether the Smith shooting was justified and whether it was handled properly. Andrew asserted that the TARU officers had not exhausted all peaceful non-lethal options and that the department had unnecessarily placed officers in harm's way.

Andrew was not under a duty to write the memorandum as part of his official responsibilities. He had not previously written similar memoranda after other officer-involved shootings. Andrew would not have been derelict in his duties as a BPD commander, nor would he have suffered any employment consequences, had he not written the memorandum. The memorandum was characterized by Clark as "unauthorized." The task of investigating officer-involved shootings falls upon the BPD's Homicide Unit and the Internal Affairs Division. Andrew did not work within either of these units nor did he have any control over their investigations. Clark ignored the Andrew Memorandum.

Thereafter, Andrew contacted a reporter from the *Baltimore Sun* newspaper, explained the situation, and provided the reporter with a copy of his memorandum. Andrew did not serve as a media spokesperson for the BPD. He provided his memorandum to the *Baltimore Sun* reporter because of his concern for public safety.

On January 6, 2004, the *Baltimore Sun* published an article (the "*Sun* Article") regarding the Smith shooting. It highlighted the concerns raised in the Andrew Memorandum. Following publication of the *Sun* Article, the BPD subjected Andrew to an Internal Affairs investigation. He was charged with giving confidential internal information to the media. As a result, Andrew lost command of the BPD's Eastern District and was placed in a less desirable position in the Evidence Control Unit. He also did not receive a stipend of $3,900 a

year he had previously received as a BPD District Commander.

In July 2004, Clark ordered Andrew to retire. Andrew responded that he would retire only if the pending Internal Affairs charges against him were dismissed and he was awarded paid time off. Clark did not accept Andrew's offer. Nevertheless, Defendant Kenneth Blackwell, a BPD deputy police commissioner, provided Andrew with paid time off. Subsequently, Andrew was placed on "out of pay" status. His compensation and benefits were terminated. Thereafter, Andrew returned to the BPD and made himself available for work.

After returning to work and not receiving any pay, Andrew's counsel sent letters to the BPD's Office of Legal Affairs, complaining that Andrew's First Amendment rights were being violated. Andrew's counsel also advised the City Solicitor that Andrew intended to bring multiple claims under Maryland law against Defendants for violating his civil rights.

Andrew also wrote Blackwell, requesting information about his status. Blackwell responded to Andrew that he was "handling this all wrong." Andrew was given a personnel order, dated October 27, 2004, which terminated his employment effective September 20, 2004, for "failing to respond to the Fire and Police Retirement Office."

On November 10, 2004, the then Mayor of Baltimore removed Clark as the BPD police commissioner. Clark was replaced by Defendant Leonard Hamm. Prior to Clark's termination, Hamm had sympathized with Andrew regarding his situation. Hamm had expressed an interest in retaining Andrew as a member of his command staff. When Hamm learned that Andrew was preparing to sue the BPD, however, his attitude changed. He maintained the termination order originally issued by Clark. Hamm received notice of the instant lawsuit on December 3, 2004. On that date, he ordered

Andrew to return to work. In an exchange of correspondence, Hamm indicated that Andrew had not been reinstated but was in a "no pay status," and that if Andrew refused to return to work, he would be deemed to have abandoned his position with the BPD. Andrew returned to work at the BPD. He was not returned to his position as a Major and the Internal Affairs charges against him have not been dropped.

## II

On November 29, 2004, Andrew filed this action. Defendants filed a joint motion to dismiss Andrew's first amended complaint. Thereafter, Andrew attempted to file a second amended complaint. The district court granted Andrew's request for leave to file a second amended complaint and looked to the allegations in the second amended complaint in order to decide Defendants' motion to dismiss.

The district court granted the Defendants' joint motion to dismiss the federal claims with prejudice. It also dismissed without prejudice the supplemental state claims for lack of subject matter jurisdiction. Andrew filed a timely notice of appeal.

The district court had jurisdiction over the action pursuant to 28 U.S.C. § 1331, as Andrew alleged claims under 42 U.S.C. § 1983. This court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## III

## A

Andrew contends that the district court erred in dismissing his § 1983 claim as a "matter of law" based on its conclusion that "[n]o reasonable juror could reasonably find that the 'internal memorandum' was other than 'speech pursuant to plaintiff's official duties.'" *Andrew*, 472 F. Supp. 2d at 663.

In reviewing a motion to dismiss an action pursuant to Rule 12(b)(6), the Supreme Court instructed in *Bell Atlantic* that we must determine whether it is plausible that the factual allegations in the complaint are "enough to raise a right to relief above the speculative level[.]" 550 U.S. at 555. In *Bell Atlantic*, the Court reasoned as follows:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Id.* (internal quotation marks, citations, and alterations omitted). We are persuaded by our "look for plausibility in this complaint" that Andrew has alleged sufficient facts to assert a right to relief above the speculative level. *Id.* at 564.

In Count I of his second amended complaint, Andrew stated that providing the *Baltimore Sun* reporter "with his views and concerns regarding the shooting death of Mr. Cyphus Smith[ ] was protected expression regarding a matter of public concern; that his interest in First Amendment expression outweighs whatever interest the Defendants had regarding maintaining control over the workplace[.]" Andrew argues that it was unnecessary for the district court to determine whether his memorandum was executed pursuant to his official duties "because the act for which [he] was terminated for [sic], the dissemination of his memorandum to [the] press, was clearly not an act pursuant to his official duties."

The district court's conclusion that the Andrew Memorandum was "speech pursuant to [his] official duties" was based upon its erroneous conclusion that "Plaintiff [had] concede[d] that, as Eastern District Commander, he was 'routinely required to provide an overview, findings and recommendations as to all significant incidents including shootings that

occurred within his district.'" *Andrew*, 472 F. Supp. 2d at 661, 663.

Nowhere in the record does Andrew make such a concession. In fact, in paragraph 18 of the second amended complaint Andrew specifically alleged that Clark had characterized his memorandum as "unauthorized," and that he had not written such a memorandum about other police-involved shootings.

During oral argument, the court inquired of counsel for the Appellees whether Andrew had conceded that he wrote the memorandum as part of his official duties. Appellees' counsel forthrightly replied:

> Before I do anything else, I want to say that the question Judge Alarcón had about the concession by the Plaintiff—as much as I hate to say this—there was no concession that writing the memorandum was part of his job. The statement referred to by the district judge was taken from one of the Defendants' memoranda.[1]

Thus, the question whether the Andrew Memorandum was written as part of his official duties was a disputed issue of material fact that cannot be decided on a motion to dismiss pursuant to Rule 12(b)(6). *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007) (district court may not resolve factual disputes on Rule 12(b)(6) motion without converting motion into one for summary judgment under Rule 56).[2]

---

[1]In their joint motion to dismiss, Defendants asserted: "As Plaintiff prepared the memorandum pursuant to his official duties, he has no First Amendment cause of action based on the Department's reaction to his publication of his speech."

[2]The district court declined to convert Defendants' 12(b)(6) motion into one for summary judgment. (*See* Joint Appendix ("JA") 31 ("I disagree with the assertion that the substance of defendants' motion is one for summary judgment; the rudimentary attachments to the motion to dismiss do not, in my view, inevitably convert the motion into a motion under Rule 56.").)

Therefore, the district court erred in concluding that "[n]o reasonable juror could reasonably find that the 'internal memorandum' was other than 'speech pursuant to plaintiff's official duties.' Accordingly, the First Amendment claim fails as a matter of law." *Andrew*, 472 F. Supp. 2d at 663.

B

In setting forth the basis for its conclusion that Andrew had failed to assert facts that would support a claim for a violation of his First Amendment rights, the district court accurately summarized the rule announced in *Garcetti* as follows: "[w]hen public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes and therefore are not insulated from 'managerial discipline' based on such statements." *Andrew*, 472 F. Supp. 2d at 661 (quoting *Garcetti*, 547 U.S. at 424). The district court failed, however, to recognize that the Supreme Court also stressed in *Garcetti* that "the parties in this case do not dispute that [the plaintiff] wrote his disposition memo pursuant to his employment duties. We thus have no occasion to articulate a comprehensive framework of the scope of an employee's duties in cases where there is room for serious debate." *Id.* at 424. Accordingly, because the parties do not agree that the facts demonstrate that Andrew wrote his memorandum as part of his official duties, contrary to the district court's conclusion, the facts alleged in Andrew's second amended complaint do not "render *Garcetti* wholly applicable." *Andrew*, 472 F. Supp. 2d at 663. At this stage of the proceedings in this matter, we must conclude that there is "room for serious debate" regarding whether Andrew had an official responsibility to submit a memorandum regarding the Smith shooting.

The district court also stated that *Garcetti* had "significantly modif[ied] the longstanding test of public employee First Amendment protection derived in *Pickering v. Bd. of Educ.*, 391 U.S. 563 [ ] (1968)." *Andrew*, 472 F. Supp. 2d at

661. In rejecting Andrew's citizen speech claim, the district court commented that

> [t]he gravamen of plaintiff's claim seems to be that when he elected to "go public" by handing a copy of his "internal memorandum" to a representative of the media, *he converted what is undeniably speech effected pursuant to his employment duties into "citizen speech" on a "matter of public concern."* I can find nothing in *Garcetti* or in the more persuasively-reasoned cases that have interpreted *Garcetti* to support this view: that the Supreme Court's plain intention to carve out an enclave of unprotected speech by public employees is so limited.

472 F. Supp. 2d at 662 (emphasis added and citations omitted).

We disagree with the district court's conclusion that *Garcetti* significantly modified the *Pickering* test regarding the protection of a public employee's First Amendment right to speak as a citizen about matters of public concern. In fact, in *Garcetti* the Court cited *Pickering* for the following principles:

> *Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no *First Amendment* cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the *possibility* of a *First Amendment* claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. This consideration

> reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

*Garcetti*, 547 U.S. at 418 (emphasis added and internal citations omitted).

Because there was no dispute in *Garcetti* that the plaintiff wrote his disposition as part of his employment duties, the Court held that "his allegation of unconstitutional retaliation must fail." *Id.* at 424. In this matter, Andrew has alleged that the preparation of his memorandum was *not* part of his official duties. At this stage of the pretrial proceedings, the district court was required to accept that statement as true. Because of its mistaken belief that Andrew had conceded that he wrote his memorandum as part of his official duties, the district court failed to consider whether it could determine, based on the facts alleged in the second amended complaint, whether Andrew's dissemination of his memorandum was citizen speech regarding a matter of public concern, or whether the publication of it affected the operation of the BPD, as required by *Garcetti* and *Pickering*.

Whether Andrew's delivery of his memorandum to a reporter for the *Baltimore Sun* "addresses a matter of public concern must be determined by the content, form, and context of a given statement, *as revealed by the whole record.*" *Connick v. Myers*, 461 U.S. 138, 147-48 (1983) (emphasis added). Only if Andrew's speech is found to address a matter of public concern does the court then "seek 'a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* at 142 (quoting *Pickering*, 391 U.S. at 568) (alteration omitted). Resolution of

these questions will depend upon the results of discovery as tested by a motion for summary judgment.

IV

We also determine that the district court erred in dismissing Andrew's petition claims on the grounds that his claims did not, as a matter of law, involve issues of public concern. Andrew maintains that his petition claims implicate a matter of public concern, namely "whether the BPD retaliates against police commanders who publicly disagree with the necessity of a police-involved shooting[.]"

Andrew alleged that he was retaliated against for petitioning the government to redress his grievances. Specifically, Andrew alleged a form of second-level retaliation — that he was terminated in retaliation for threatening to file suit regarding the original retaliation he faced upon disseminating his memorandum to the press. The facts alleged in the second amended complaint are similar to those found in *Kirby v. City of Elizabeth City*, 388 F.3d 440 (4th Cir. 2004). In *Kirby*, this Court held that the plaintiff police officer's second-level retaliation claim implicated matters of public concern for First Amendment purposes even though his initial speech related to a private matter. *Id.* at 449 (finding that plaintiff's "grievance and lawsuit concerned a subject of much greater interest to the public, namely whether the police chief and his lieutenant retaliated against Kirby for providing truthful testimony") (emphasis omitted).

The district court concluded that Andrew's petition claims fail as a matter of law because they concerned "matters of a wholly personal dimension, i.e., his desire to seek damages and obtain injunctive relief aimed at getting back his job." *Andrew*, 472 F. Supp. 2d at 663 n.5. We disagree. Andrew has asserted viable petition claims because he alleges that the first-level retaliation was an Internal Affairs investigation due to his distribution of his memorandum to the press, and that

the second level of retaliation was his termination for threatening to file suit for the first level of retaliation. Accordingly, the district court erred in dismissing Andrew's petition claims.

V

The district court also rejected Andrew's procedural due process claims. It held that his "attempt to transform a state law claim for reinstatement to a lower rank into a federal procedural due process claim fails" because "there is no *federal procedural due process issue [ ] presented*" and Andrew was at most "not entitled to a *hearing*, he was entitled to a *job*." *Andrew*, 472 F. Supp. 2d at 664, 664 n.6 (emphasis in original).

As the district court properly pointed out, "[t]he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citing U.S. C<span style="font-variant:small-caps">onst</span>. amend. XIV; *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). "Only after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process." *Sullivan*, 526 U.S. at 59 (citation omitted). A government employee "has a protected property interest in continued public employment only if he can show a 'legitimate claim of entitlement' to his job under state or local law." *Luy v. Baltimore Police Dep't*, 326 F. Supp. 2d 682, 689 (D. Md. 2004) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577-78 (1972)). "A public employee in an at-will position cannot establish such an entitlement, and thus cannot claim any Fourteenth Amendment due process protection." *Id.* at 689-90 (citing *inter alia*, *Pittman v. Wilson County*, 839 F.2d 225, 229 (4th Cir. 1988)).

However, the Supreme Court has held that even if a government employee is at-will, he may still allege an entitlement to termination "for cause" if he can show the existence of

"rules and understandings, promulgated and fostered by state officials" promoting such a procedure. *Perry v. Sindermann*, 408 U.S. 593, 602 (1972). In *Perry*, the Court held, in relevant part:

> [R]espondent has alleged the existence of rules and understandings, promulgated and fostered by state officials, that may justify his legitimate claim of entitlement to continued employment absent "sufficient cause." . . . [W]e agree that the respondent must be given an opportunity to prove the legitimacy of his claim of such entitlement in light of "the policies and practices of the institution." Proof of such a property interest would not, of course, entitle him to reinstatement. But such proof would obligate college officials to grant a hearing at his request, where he could be informed of the grounds for his nonretention and challenge their sufficiency.

*Perry*, 408 U.S. at 602-03 (citations omitted).

Maryland law suggests that Andrew, who was a Major at the time of his termination, served "at [the] pleasure" of the Commissioner. *See* Pub. Loc. L. Md. Art. 4 § 16-7(3).[3] Nevertheless, Andrew argues that, pursuant to *Perry*, he could only be terminated for cause and with a hearing. Andrew alleges in Count IX of the second amended complaint that:

> [A] mutual implied understanding existed within the BPD . . . that an individual who serves the BPD as a command level official, such as [himself]. . . has a right to a fair and impartial investigation and/or to

---

[3]Public Local Law Article 4 § 16-11 also provides that "[a]ll members of the Department, *except those serving at the pleasure of the Commissioner* . . . shall be retained in the Department during good behavior and efficiency and may be dismissed or removed[ ] from the Department only for cause[.]" (Emphasis added.)

return to his highest level civil service rank (Captain or below), if his services are no longer desired; whereupon [he] could only be terminated for cause and according to the laws of the State of Maryland and the City of Baltimore, along with the rules, regulations, and orders of the BPD.

In support, Andrew relies on somewhat ambiguous provisions of Maryland law, providing that:

Notwithstanding any provisions of this section, or of this subtitle, the Commissioner may make any appointment to the Department above the rank of captain, without examination, except that no such position shall be filled by a police officer within the Department of a rank less than lieutenant, and where any such appointment is made the police officer so appointed shall, upon the termination of his service in such position, *be returned to the rank from which he was elevated*, or to such higher rank as he became eligible to serve in during his appointment.

Pub. Loc. L. Md. Art. 4 § 16-10(d) (emphasis added). Relying upon this provision, Andrew alleges that he could not be terminated entirely, but would instead be demoted to the rank from which he was elevated (that is, demoted to a Lieutenant). While this interpretation may appear a bit strained, we must draw all inferences in the light most favorable to Andrew. The district court itself noted that there was "some uncertainty" as to how to resolve what seemed to be a "guarantee of a lower-level job upon the termination of [one's] appointment to a command level position[.]" *Andrew*, 472 F. Supp. 2d at 664. Based upon Andrew's allegations that he was a 31-year veteran of the BPD, that there was a guarantee of a lower-level job upon termination of a command level position, and that Clark demoted (rather than terminated) other command level officials, Andrew has alleged valid procedural due process claims and should "be given an opportunity to prove the legit-

imacy of his claim of such entitlement in light of the policies and practices of the institution." *Perry*, 408 U.S. at 603 (internal quotation marks and citations omitted).

## VI

Andrew also argues that the district court erred in denying his motion for partial summary judgment on the ground that, procedurally, the motion was unopposed by Defendants. On the merits, Andrew argues that there is no genuine issue of material fact that his delivery of his memorandum to the press related to a matter of public concern and that the *Pickering* balancing test weighs in his favor. We hold that the district court did not err in denying Andrew's motion for partial summary judgment.

Rule 56(e)(2) of the Federal Rules of Civil Procedure provides as follows:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment *should, if appropriate*, be entered against that party.

Fed. R. Civ. P. 56(e)(2) (emphasis added). The Advisory Committee Notes to Rule 56 highlight that the language was amended from the stricter "shall [if appropriate]" language to the more discretionary "should [if appropriate]" language. *See* Fed. R. Civ. P. R. 56(e) (2007 Amendments). The Advisory Committee Notes also highlight the discretion that district courts are given to deny summary judgment motions even when the standard appears to have been met. *See* 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure: Civil* § 2728 (3d ed. 2008) ("the court has discretion to deny

a Rule 56 motion"); *see also Forest Hills Early Learning Ctr., Inc. v. Lukhard*, 728 F.2d 230, 245 (4th Cir. 1984) ("Even where summary judgment is appropriate on the record so far made in a case, a court may properly decline, for a variety of reasons, to grant it.") (citing Wright & Miller).

Accordingly, given: (1) the discretion accorded district courts in deciding whether or not to grant motions for summary judgment; (2) the apparent disputed facts regarding the nature of Andrew's speech, highlighted in the above discussion; and (3) the lack of a developed record at this stage in proceedings, we conclude that the district court did not abuse its discretion in denying Andrew's motion for partial summary judgment.

## VII

Andrew further claims that the district court abused its discretion in denying his motion for costs and fees associated with effectuating personal service on Clark. Andrew argues that the district court's order "ignored the plain weight of the evidence that Clark, who had a history of evading service, had refused to waive service." We disagree.

Rule 4(d) of the Federal Rules of Civil Procedure provides that a plaintiff may request that a defendant waive service of a summons. Fed. R. Civ. P. 4(d)(1). Such notice and request must, among other things, "give the defendant a reasonable time of *at least* 30 days after the request was sent" to return the waiver. *Id.* 4(d)(1)(F) (emphasis added). A plaintiff must serve a defendant within 120 days of filing the complaint. *Id.* 4(m).

While this court has not expressly ruled on the applicable standard of review in deciding motions for costs and fees brought pursuant to Rule 4(d), the Ninth Circuit has held, and we agree, that the appropriate standard of review is abuse of discretion. *See Estate of Darulis v. Garate, et al.*, 401 F.3d

1060, 1063 (9th Cir. 2005) ("Darulis contends that because the defendants failed to waive service of process, he is entitled to an award of the costs he incurred in effecting service on the defendants. We review the district court's denial of costs for an abuse of discretion.") (citation omitted).

Here, the initial complaint was filed on November 29, 2004 and Clark was served on January 29, 2005. As the district court noted, the complaint itself alleged that Clark was a New York citizen who maintained a "temporary home" in Maryland. Andrew retained a process server on January 3, 2005, even though Clark was mailed the request for waiver of service — to his temporary Maryland home only — on December 2, 2004. Clark was personally served in New York on January 29, 2005, less than two months after the waiver was requested, and on the same day that a certified letter was signed for in New York by someone acting on his behalf at his New York address. Clark was served "well within" the 120 day period required to effectuate service.

While Andrew may not agree with the district court's decision that he failed to afford Clark a reasonable time to waive service, the above facts provide ample support for the district court's conclusion. Accordingly, we affirm.

## CONCLUSION

For the reasons discussed above, we vacate and remand, for further proceedings consistent with this opinion, the district court's dismissal of Andrew's First Amendment claims, petition claims, and procedural due process claims. We affirm the district court's denial of Andrew's motion for partial summary judgment and affirm the district court's denial of Andrew's fee and costs motion.

*VACATED AND REMANDED IN PART AND*
*AFFIRMED IN PART*

WILKINSON, Circuit Judge, concurring:

I agree that the dismissal of Andrew's First Amendment claims was premature. In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the employee spoke on a matter as a part of his official duties. Here, as the court notes, that is very much in dispute. In *Garcetti*, the employee did not distribute the statement to a news organization. Here he did. And the matter about which Andrew spoke was not just an office quarrel or routine personnel action, but a question of real public importance, namely whether a police shooting of a citizen was justified and whether the investigation of that shooting was less than forthcoming.

To throw out this citizen who took his concerns to the press on a motion to dismiss would have profound adverse effects on accountability in government. And those effects would be felt at a particularly parlous time. It is well known that the advent of the Internet and the economic downturn have caused traditional news organizations throughout the country to lose circulation and advertising revenue to an unforeseen extent. As a result, the staffs and bureaus of newsgathering organizations—newspapers and television stations alike—have been shuttered or shrunk. Municipal and statehouse coverage in particular has too often been reduced to low-hanging fruit. The in-depth investigative report, so essential to exposure of public malfeasance, may seem a luxury even in the best of economic times, because such reports take time to develop and involve many dry (and commercially unproductive) runs. And in these most difficult of times, not only investigative coverage, but substantive reports on matters of critical public policy are increasingly shortchanged. So, for many reasons and on many fronts, intense scrutiny of the inner workings of massive public bureaucracies charged with major public responsibilities is in deep trouble.

The verdict is still out on whether the Internet and the on-line ventures of traditional journalistic enterprises can help fill

the void left by less comprehensive print and network coverage of public business. While the Internet has produced information in vast quantities, speedy access to breaking news, more interactive discussion of public affairs and a healthy surfeit of unabashed opinion, much of its content remains derivative and dependent on mainstream media reportage. It likewise remains to be seen whether the web—or other forms of modern media—can replicate the deep sourcing and accumulated insights of the seasoned beat reporter and whether niche publications and proliferating sites and outlets can provide the community focus on governmental shortcomings that professional and independent metropolitan dailies have historically brought to bear.

There are pros and cons to the changing media landscape, and I do not pretend to know what assets and debits the future media mix will bring. But this I do know—that the First Amendment should never countenance the gamble that informed scrutiny of the workings of government will be left to wither on the vine. That scrutiny is impossible without some assistance from inside sources such as Michael Andrew. Indeed, it may be more important than ever that such sources carry the story to the reporter, because there are, sad to say, fewer shoeleather journalists to ferret the story out.

So I concur in Judge Alarcón's fine opinion, because it recognizes this core First Amendment concern with the actual workings—not just the speeches and reports and handouts—of our public bodies. This case may seem a small one, involving a single incident in a single locality, but smaller cases are often not without larger implications. The court is right to note that at this early stage, we cannot foresee who will prevail. But as the state grows more layered and impacts lives more profoundly, it seems inimical to First Amendment principles to treat too summarily those who bring, often at some personal risk, its operations into public view. It is vital to the health of our polity that the functioning of the ever more com-

plex and powerful machinery of government not become democracy's dark lagoon.