PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-1081

KENNETH L. HUNTER; RICK A. DONATHAN; JERRY D. MEDLIN,

Plaintiffs – Appellees,

v.

TOWN OF MOCKSVILLE, NORTH CAROLINA; ROBERT W. COOK, in his official capacity as Administrative Chief of Police of the Mocksville Police Department and in his individual capacity; CHRISTINE W. BRALLEY, in her official capacity as Town Manager of the Town of Mocksville and in her individual capacity,

Defendants – Appellants.

------------------------------

NATIONAL ASSOCIATION OF POLICE ORGANIZATIONS,

Amicus Supporting Appellees.

No. 14-1125

KENNETH L. HUNTER; RICK A. DONATHAN; JERRY D. MEDLIN,

Plaintiffs – Appellants,

v.

TOWN OF MOCKSVILLE, NORTH CAROLINA; ROBERT W. COOK, in his official capacity as Administrative Chief of Police of the Mocksville Police Department and in his individual capacity; CHRISTINE W. BRALLEY, in her official capacity as Town

Manager of the Town of Mocksville and in her individual capacity,

Defendants - Appellees.

_____

NATIONAL ASSOCIATION OF POLICE ORGANIZATIONS,

Amicus Supporting Appellants.

_____

Appeals from the United States District Court for the Middle District of North Carolina, at Greensboro. Catherine C. Eagles, District Judge. (1:12-cv-00333-CCE-JEP)

_____

Argued: December 9, 2014                    Decided: June 15, 2015

_____

Before NIEMEYER, WYNN, and DIAZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Wynn wrote the majority opinion, in which Judge Diaz joined. Judge Niemeyer wrote a dissenting opinion.

_____

**ARGUED**: Stephen John Dunn, VAN HOY, REUTLINGER, ADAMS & DUNN, Charlotte, North Carolina, for Appellants/Cross-Appellees. Robert Mauldin Elliot, Helen Parsonage, ELLIOT MORGAN PARSONAGE, PLLC, Winston-Salem, North Carolina, for Appellees/Cross-Appellants. **ON BRIEF**: Jaye E. Bingham-Hinch, Raleigh, North Carolina, Patrick H. Flanagan, CRANFILL, SUMNER & HARTZOG, LLP, Charlotte, North Carolina; Philip M. Van Hoy, VAN HOY, REUTLINGER, ADAMS & DUNN, Charlotte, North Carolina, for Appellants/Cross-Appellees. J. Michael McGuinness, THE MCGUINNESS LAW FIRM, Elizabethtown, North Carolina; William J. Johnson, NATIONAL ASSOCIATION OF POLICE ORGANIZATIONS, Alexandria, Virginia, for Amicus Curiae.

_____

WYNN, Circuit Judge:

"Almost 50 years ago, th[e Supreme] Court declared that citizens do not surrender their First Amendment rights by accepting public employment." Lane v. Franks, 134 S. Ct. 2369, 2374 (2014). A threshold question for determining "whether a public employee's speech is entitled to protection" is whether the employee "spoke as a citizen on a matter of public concern." Id. at 2378 (quotation marks and citation omitted).

In this Section 1983 case alleging First Amendment rights violations, viewing the evidence in their favor—as we must at summary judgment, Plaintiffs—officers of the Mocksville Police Department ("Mocksville PD") in Mocksville, North Carolina—reached out as concerned citizens to the North Carolina Governor's Office about corruption and misconduct at the Mocksville PD. The district court therefore rightly rejected Defendants' argument that Plaintiffs' outreach enjoyed no First Amendment protection. For this and other reasons explained below, we affirm the district court's denial of summary judgment to Defendants Robert W. Cook and Christine W. Bralley.

I.

Viewing the evidence in the light most favorable to Plaintiffs, the non-movants, as we must at the summary judgment stage, the evidence shows that Plaintiffs Kenneth L. Hunter

3

("Hunter"), Rick A. Donathan ("Donathan"), and Jerry D. Medlin ("Medlin"), served as police officers with the Mocksville PD. Hunter, an assistant chief, had worked for the Mocksville PD since 1985; Donathan, a lieutenant, had been with the Mocksville PD since 1998; and Medlin had served as an officer since 2006. All three Plaintiffs had distinguished careers with the Mocksville PD, receiving honors and promotions throughout their tenures.

Defendant Robert W. Cook ("Cook") joined the Mocksville PD as police chief in 2005.[1] Over time, Plaintiffs became concerned about Cook's behavior and leadership. For example, Plaintiffs saw Cook drink alcohol publicly, excessively, and while in uniform and feared that it reflected poorly on the Mocksville PD. Plaintiffs also believed that Cook violated the law by driving a police car with blue flashing lights and behaving as if he were a certified law enforcement officer when, in reality, he had never been certified and was only an "administrative" chief. Plaintiffs suspected that Cook and his ally and deputy chief, Daniel Matthews, were together mismanaging Mocksville PD and other public funds and even using those funds for personal gain. Plaintiffs perceived racial discrimination at the

---

[1] Cook no longer serves as the Mocksville PD chief.

Mocksville PD. And Plaintiffs believed that Cook "fixed" tickets for his friends.

Plaintiffs independently raised such concerns about Cook with Mocksville Town Manager, Defendant Christine W. Bralley ("Bralley"). Yet they noticed no improvement after reporting their concerns to Bralley and instead perceived reasons to worry about retaliation. Donathan, for example, raised his concerns with Bralley and was soon thereafter criticized by Matthews about a concern he had raised with Bralley. And a month after Medlin sent Bralley a sealed letter detailing concerns about the Mocksville PD, Cook demoted him. (That demotion was ultimately reversed.)

In November 2011, the situation at the Mocksville PD escalated. Cook reorganized the department, elevating Matthews to second-in-command and stripping Hunter, one of only two African-Americans at the Mocksville PD, of his supervisory responsibilities. Hunter filed a grievance about his demotion, but his grievance, and concerns, were dismissed. Donathan, on the other hand, was invited to Cook's home, instructed to "adhere to the 'politics' of the MPD," and promoted to lieutenant. J.A. 161.

In early December 2011, five Mocksville PD officers, including all three Plaintiffs, met privately to discuss their concerns about Cook and his ally Matthews. At that meeting,

5

Plaintiffs decided to seek an investigation by an outside agency into corruption at the Mocksville PD. According to Hunter, Plaintiffs made this decision because they felt, "as citizens of the community, that Mocksville deserved an effective police force that served everyone equally" and not because they felt it was "part of our job duties." J.A. 137.

Plaintiffs set up a meeting with local representatives of the National Association for the Advancement of Colored People ("NAACP"), who, after hearing Plaintiffs' concerns, advised them to contact a state agency. Accordingly, Plaintiffs decided to contact the North Carolina Attorney General. Hunter had his "daughter purchase a disposable phone at Wal-Mart that could be used to report our citizen complaints separately from our affiliation with the MPD." Id.

On December 14, 2011, Plaintiffs got together and used the disposable phone to call the Attorney General's Office. The Attorney General, however, referred Plaintiffs to local authorities who were closely aligned with Cook and whom Plaintiffs therefore felt they could not contact. Plaintiffs then called the North Carolina Governor's Office, again using the disposable phone. Without identifying either themselves or the Mocksville PD, Plaintiffs conveyed some of their concerns, including their suspicions that Cook embezzled funds, had a drinking problem, and masqueraded as a certified officer with

6

powers to, for example, use blue lights and pull people over even though he was only an administrative chief without the authority to do so. The Governor's Office representative asked for a telephone number at which someone could return the call, and Plaintiffs gave the number for the disposable phone.

Later that day, someone else from the Governor's Office called the disposable phone. Donathan answered the call, spoke to the representative, and identified the Mocksville PD to the representative. The Governor's Office representative offered to request that the State Bureau of Investigation ("SBI") investigate the Mocksville PD.

The next week, Medlin saw the local SBI Agent, D.J. Smith, at the Mocksville PD offices. Plaintiffs knew that Smith had a close relationship with both Cook and Matthews. Medlin saw Smith show Matthews a piece of paper and saw the two men look for Cook. On December 22, 2011, Plaintiffs received a message from Smith, who called the disposable phone. Smith left a message identifying himself and stating that he was following up on the request for an investigation. Plaintiffs did not return the call because "we did not trust any local authorities in investigating our concerns because of Chief Cook's influence" and thus "disposed of the phone for fear that Chief Cook may search the police department and find it." J.A. 140.

7

As it turned out, the phone was nevertheless "found." Smith contacted the Davie County Sheriff's Office, the county in which Mocksville is located, and asked an officer there to check whether the phone number used to make that complaint belonged to anyone at the Sheriff's Office. The Sheriff's Department officer contacted the Mocksville PD and asked an officer there to run the number through Mocksville PD records. The officer also called the disposable phone himself—though Plaintiffs did not pick up.

On December 27, 2011, Bralley contacted Sprint customer service to set up an online account, explaining that she wanted to check call records for a specific telephone number. The Sprint invoice issued that same day for the billing period ending December 23, 2011 included phone calls to the disposable phone's number. Both Donathan and Medlin had placed calls to and received calls from the disposable phone using their Mocksville PD-issued mobile phones.

On December 29, 2011, Chief Cook fired all three Plaintiffs. This was the first time Cook had fired anyone during his tenure as the Mocksville PD chief. Officer misbehavior—including illegal drug use and even criminal activity—had previously occurred. But the officers in those cases received lesser punishments or were allowed to voluntarily resign rather than be fired.

8

All three Plaintiffs received similar termination letters that gave performance justifications such as "[i]nsubordinat[ion]," "[a]ttitude," "[r]umored [f]alse [d]eter mental [sic] [i]nformation," and "other conduct unbecoming a Officer." J.A. 153, 178. Plaintiffs had been given no notice of these performance issues before they were fired. In an after-the-fact memo to the town attorney, Cook expressly mentioned Plaintiffs' telephone call to the Governor and SBI, claiming Plaintiffs "conspire[d]" to discredit him, Bralley, and others in calls to "SBI and Governor with false information"—information Cook claimed "[t]he SBI and DA have determined . . . to be slanderous and false." J.A. 543. And around the time Cook fired Plaintiffs, Cook called the local district attorney and told him that "you can't have people in-house that are continually undercutting you and causing trouble." J.A. 2009.

In April 2012, Plaintiffs brought suit against Cook, Bralley, and the Town of Mocksville, alleging, among other things, that their First Amendment rights were violated when they were fired for speaking out about corruption and misconduct at the Mocksville PD. Defendants answered, and discovery ensued. Defendants then moved for summary judgment, which Plaintiffs opposed. Initially, in October 2013, the district court granted summary judgment to all Defendants on the Section 1983 claims but denied summary judgment as to the state law

wrongful discharge and constitutional claims. In January 2014, however, the district court granted a motion for reconsideration and reversed course as to Cook and Bralley, holding that neither was entitled to qualified immunity.

The parties challenge aspects of both orders in this appeal. We review these summary judgment rulings de novo, viewing the evidence in the light most favorable to the non-moving party—here, Plaintiffs—and drawing all reasonable inferences in their favor. Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc).

II.

Defendants argue that they are entitled to qualified immunity, which shields government officials "who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). To successfully avail themselves of qualified immunity, Defendants must show either that no constitutional violation occurred or that the right violated was not clearly established at the time it was violated. Id. Defendants argue primarily that no violation occurred.

A.

10

With their first argument, Defendants contend that the district court erred in ruling that Plaintiffs spoke as citizens and not as employees when they reached out to the Governor's Office. Accordingly, per Defendants, the First Amendment does not protect Plaintiffs from retaliation. We disagree.

1.

"Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" Lane, 134 S. Ct. at 2377 (quoting Roth v. United States, 354 U.S. 476, 484 (1957)). This remains true when speech concerns information related to public employment. "After all, public employees do not renounce their citizenship when they accept employment, and this Court has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights." Id. (citing, inter alia, Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill., 391 U.S. 563, 568 (1968)).

In its most recent statement on public employee speech, a unanimous Supreme Court underscored the "considerable value" of "encouraging, rather than inhibiting, speech by public employees. For government employees are often in the best position to know what ails the agencies for which they work."

11

<u>Lane</u>, 134 S. Ct. at 2377 (quotation marks, alterations, and citation omitted). Were public employees not able to speak on matters of public concern, "the community would be deprived of informed opinions on important public issues." <u>San Diego v. Roe</u>, 543 U.S. 77, 82 (2004) (per curiam). Indeed, "[t]he interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." <u>Id.</u> The Supreme Court thus underscored last year in <u>Lane</u> that "[i]t bears emphasis that our precedents . . . have recognized that speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." 134 S. Ct. at 2379.

Further, as the Supreme Court has recognized, "[t]he importance of public employee speech is especially evident in the context of . . . a public corruption scandal." <u>Id.</u> at 2380. Indeed "[i]t would be antithetical to our jurisprudence to conclude that the very kind of speech necessary to prosecute corruption by public officials—speech by public employees regarding information learned through their employment—may never form the basis for a First Amendment retaliation claim." <u>Id.</u>

That being said, precedent makes clear that courts must also consider "the government's countervailing interest in controlling the operation of its workplaces." <u>Id.</u> at 2377.

12

"Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006).

Accordingly, courts must "balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568. As the Supreme Court explained in Garcetti, this balancing test boils down to a two-step inquiry: The first question is "whether the employee spoke as a citizen on a matter of public concern. If the answer is no," First Amendment protections are not implicated. 547 U.S. at 418. If, however, the answer is yes, then we must ask whether the employee's interest in speaking out about the matter of public concern outweighed the government's interest in providing effective service to the public. Id.

In determining whether the employee spoke as an employee or as a citizen—the question at the heart of this appeal—the Supreme Court has instructed us to engage in a "practical" inquiry into the employee's "daily professional activities" to discern whether the speech at issue occurred in the normal course of those ordinary duties. Garcetti, 547 U.S. at 422,

13

424. The Supreme Court expressly rejected a focus on "formal job descriptions," eschewing "the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions." Id. at 424. And just last year in Lane, the Supreme Court unanimously admonished lower courts for "read[ing] Garcetti" and its employee speech implications "far too broadly." 134 S. Ct. at 2379. The Court emphasized that "[t]he critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Id.

In Garcetti, the speech at issue was an internal memorandum a deputy district attorney had prepared for his supervisors recommending a particular disposition in a specific case. 547 U.S. at 410. The Supreme Court noted that the deputy "did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case." Id. at 422. Accordingly, the internal memorandum, which fell within the scope of the deputy's ordinary duties, did not constitute protected speech. Id. at 421-22.

By contrast, in Lane, the Supreme Court held that a public employee's sworn testimony in a judicial proceeding was

14

"quintessential" citizen speech—"even when the testimony relates to . . . public employment or concerns information learned during that employment." 134 S. Ct. at 2378-79. The Court recognized that a testifying public employee "may bear separate obligations to his employer—for example, an obligation not to show up to court dressed in an unprofessional manner." Id. at 2379. But any such obligation is distinct from "the obligation, as a citizen, to speak the truth." Id. Further, the Supreme Court left no doubt that the subject matter of the speech at issue in Lane—"corruption in a public program and misuse of state funds—obviously involves a matter of significant public concern." Id. at 2380. And the defendants in Lane had failed to demonstrate a governmental interest that could nevertheless tip the balance in their favor. Id. at 2381.

Similarly, in Pickering, a teacher was fired after he wrote a letter to the editor of a local newspaper critical of how the superintendent of schools had handled proposals to raise school revenue. Pickering, 391 U.S. at 564. The Supreme Court held that the letter, which neither "impeded the teacher's proper performance of his daily duties in the classroom" nor "interfered with the regular operation of the schools generally," constituted protected speech. Id. at 572-73. The Supreme Court underscored that "whether a school system requires additional funds is a matter of legitimate public concern." Id.

15

at 571. On such matters, "free and open debate is vital," and teachers are "most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." Id. at 571-72.

Even in our own Circuit, we have made clear that the "core First Amendment concern" is "the actual workings—not just the speeches and reports and handouts—of our public bodies." Andrew v. Clark, 561 F.3d 261, 273 (4th Cir. 2009) (Wilkinson, J., concurring). Therefore, in Andrew, we reversed the dismissal of a Section 1983 complaint in which a former police commander alleged retaliation for disclosing to the news media an internal report he had authored questioning both a police shooting and the police investigation into the shooting. It would have been "inimical to First Amendment principles to treat too summarily those who bring, often at some personal risk, [the government's] operations into public view." Id.

Likewise, in Durham v. Jones, we upheld a jury verdict for a plaintiff police officer terminated in retaliation for speaking out about law enforcement misconduct. 737 F.3d 291 (4th Cir. 2013). In Durham, the plaintiff prepared a report about an incident that had involved the use of force. Id. at 294. Other officers and detectives aggressively interrogated

16

the plaintiff and ordered him to revise his incident report. He refused. Id. Ultimately, the plaintiff decided to "bring to light actual or potential wrongdoing on the part of his superiors, calling for an external investigation and media coverage." Id. at 300 (quotation marks and citation omitted). He sent a letter and written materials to, among others, the State's Attorney and the Governor of Maryland. Id. We made it clear that this situation was "no ordinary workplace dispute," and that "where public employees are speaking out on government misconduct, their speech warrants protection." Id. at 303 (quotation marks and citation omitted).

## 2.

Turning to the facts of this case, Defendants contend that "Plaintiffs' speech was not protected because they spoke as employees, not as citizens." Appellants' Br. at 23. Defendants argue that Plaintiffs' "calling the Governor's Office was pursuant to their official duties . . . . When a police officer reports a crime, he is literally just doing his job." Id. at 30. With this characterization of Plaintiffs' speech, we cannot agree.

Nothing before us suggests that Plaintiffs' "daily professional activities," Garcetti, 547 U.S. at 422, included calling the Governor's Office for any purpose, much less to express concerns about the Mocksville PD. Nothing suggests that

17

Plaintiffs' request that the Governor's Office look into suspected corruption and misconduct at the Mocksville PD was "ordinarily within the scope of [Plaintiffs'] duties." Lane, 134 S. Ct. at 2379. Indeed, a "practical" inquiry into Plaintiffs' day-to-day duties, Garcetti, 547 U.S. at 424, manifestly does not lead to the conclusion that those included reaching out to the Governor's Office about anything at all.

Instead, the evidence viewed in the light most favorable to Plaintiffs illustrates that Plaintiffs acted as private citizens. It is undisputed that Plaintiffs first met, in their free time and away from their Mocksville PD offices, with a non-governmental organization—the NAACP—about perceived misconduct and corruption at the Mocksville PD. The NAACP suggested reaching out to a state agency. Accordingly, using a private disposable phone away from the Mocksville PD, Plaintiffs first contacted the North Carolina Attorney General's Office and ultimately the North Carolina Governor's Office. Initially, Plaintiffs identified neither themselves nor the Mocksville PD. Only after a Governor's Office representative offered to request an SBI investigation did Plaintiffs name the Mocksville PD as the subject of their concerns.

Defendants counter that Plaintiffs acted pursuant to their official duties because all sworn police officers have a duty to enforce criminal laws, and Plaintiffs, police officers,

18

suspected criminal conduct. While some of the suspected corruption and misconduct at issue here, such as misusing public funds for personal gain, might qualify as criminal, other misconduct, such as racial discrimination within the Mocksville PD, might not. Moreover, and more importantly, a general duty to enforce criminal laws in the community does not morph calling the Governor's Office because the chief of police himself is engaging in misconduct into part of an officer's daily duties.

Defendants further argue that the Mocksville Police Manual broadly obligated Plaintiffs to, among other things: "cooperate with all Law Enforcement agencies, other City Departments, and Public service organizations and . . . give aid and information as such organizations may be entitled to receive," J.A. 3306; report in writing other "employees violating laws" (though Defendants conveniently omit from their brief to whom such written reports of employee malfeasance are to be submitted: "to the Chief of Police"), J.A. 3318; and generally "enforce all Federal, State, and City laws and ordinances coming within departmental jurisdiction," J.A. 3305. But the Supreme Court has expressly rejected focusing on "formal job descriptions," as well as any "suggestion that employers can restrict employees' rights by creating excessively broad job descriptions." Garcetti, 547 U.S. at 424.

19

In sum, privately reaching out to the Governor's Office about suspected corruption and misconduct at the Mocksville PD, at the hands of the chief of police, cannot fairly or accurately be portrayed as simply part of Plaintiffs' "daily professional activities." Garcetti, 547 U.S. at 422. In reaching out to the Governor's Office, Plaintiffs were not "just doing [their] job." Appellants' Br. at 30. Rather, Plaintiffs spoke as citizens, on a matter of undisputedly public concern,[2] and no countervailing government interest has even been suggested. Accordingly, the district court rightly rejected Defendants' motion for summary judgment on this basis.

B.

With their next argument, Defendants contend that Plaintiffs' speech was not a motivating factor in their being fired. Defendants contend that Plaintiffs therefore cannot succeed with their First Amendment retaliatory discharge claims. See, e.g., Wagner v. Wheeler, 13 F.3d 86, 90 (4th Cir. 1993) (holding that a plaintiff claiming retaliatory discharge in violation of his First Amendment rights "must show that his protected expression was a 'substantial' or 'motivating' factor

---

[2] Defendants do not even attempt to argue on appeal that public corruption does not constitute a matter of public concern.

in the employer's decision to terminate him" (citation omitted)). This issue is, however, not properly before us.

The Supreme Court has made clear that "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." Johnson v. Jones, 515 U.S. 304, 319-20 (1995).[3] Stated differently, "[i]f summary judgment was denied as to a particular claim solely because there is a genuine issue of material fact, that claim is not immediately appealable and we lack jurisdiction to consider it." Iko v. Shreve, 535 F.3d 225, 235 (4th Cir. 2008).

---

[3] By contrast, the Supreme Court has left no doubt that "a district court's order denying a defendant's motion for summary judgment [is] an immediately appealable 'collateral order' (i.e., a 'final decision') . . . where (1) the defendant was a public official asserting a defense of 'qualified immunity,' and (2) the issue appealed concerned, not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of 'clearly established' law." Johnson, 515 U.S. at 311 (citations omitted). Indeed, this kind of summary judgment is otherwise "'effectively unreviewable,' for review after trial would come too late to vindicate one important purpose of 'qualified immunity'—namely, protecting public officials, not simply from liability, but also from standing trial." Id. at 312 (citation omitted).

Fatally for Defendants' argument here, the district court denied summary judgment because a material dispute of fact existed on the causation issue:

> The plaintiffs have offered sufficient evidence to support a jury finding that the Town fired them for reporting to the Governor's office that the Mocksville Police Department was experiencing corruption and other issues. While the Town has offered evidence that the plaintiffs were fired for performance issues, that evidence does not entitle them to summary judgment. It merely creates a disputed question of material fact which a jury must decide. The defendants are not entitled to summary judgment on this basis.

Hunter v. Town of Mocksville, N.C., No. 1:12-CV-333, 2013 WL 5726316, at *4 (M.D.N.C. Oct. 21, 2013), vacated in part, 2014 WL 881136 (M.D.N.C. Jan. 22, 2014). Because the district court rejected Defendants' causation argument due to a dispute of material fact, we must refrain from considering it. See Iko, 535 F.3d at 234-35.

## C.

With their final argument on appeal, Defendants contend that even if Plaintiffs' First Amendment rights were violated, those rights were not clearly established at the time, i.e., in December 2011. Accordingly, Cook and Bralley argue that they are entitled to qualified immunity protecting them from suit.

Qualified immunity shields government officials "who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions

22

were lawful." Henry, 652 F.3d at 531. Regarding whether a right was clearly established, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 534 (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001), overruled in part on other grounds, Pearson v. Callahan, 555 U.S. 223 (2009)).

To ring the "clearly established" bell, there need not exist a case on all fours with the facts at hand. In other words, "the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent the denial of qualified immunity." Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999) (holding that First Amendment rights of an off-duty officer communicating about concealed weapons were sufficiently established by precedent regarding off-duty officer's entertainment performances). "Rather, the unlawfulness must be apparent in light of pre-existing law." Trulock v. Freeh, 275 F.3d 391, 400 (4th Cir. 2001).

Turning to the right at issue here—namely First Amendment expressive rights of public employees—we have expressly held that "it was clearly established in the law of this Circuit in September 2009 that an employee's speech about serious governmental misconduct, and certainly not least of all serious misconduct in a law enforcement agency, is protected." Durham,

23

737 F.3d at 303-04 (citation omitted). As discussed in greater detail above, in Durham, a police officer claimed he was terminated in retaliation for speaking out about law enforcement misconduct. The plaintiff officer wrote a report about an incident involving the use of force and refused to bow to pressure to revise the report. After the plaintiff officer sent written materials including the report to, among others, the Governor of Maryland, he was fired. We called this situation "no ordinary workplace dispute" and made clear that "where public employees are speaking out on government misconduct, their speech warrants protection." Id. at 303 (quotation marks and citation omitted).

In holding that "it was clearly established in the law of this Circuit" in 2009 that "an employee's speech about serious governmental misconduct," and especially "serious misconduct in a law enforcement agency, is protected," Durham, 737 F.3d at 303-04, we relied on Andrew, 561 F.3d at 266-68. In Andrew, we concluded that an officer had stated a claim under the First Amendment where he alleged retaliation for releasing to the media an internal report he had authored questioning a police shooting and the investigation into the shooting. Id. at 261-62. As Judge Wilkinson noted in his concurring opinion, it would be "inimical to First Amendment principles to treat too summarily those who bring, often at some personal risk, [the

24

government's] operations into public view." Id. at 273 (Wilkinson, J., concurring). In Judge Wilkinson's lyrical words, "[i]t is vital to the health of our polity that the functioning of the ever more complex and powerful machinery of government not become democracy's dark lagoon." Id.

Andrew and Durham clearly established that, long before the December 2011 speech and retaliation at issue here, "speech about serious governmental misconduct, and certainly not least of all serious misconduct in a law enforcement agency, is protected." Durham, 737 F.3d at 303–04 (citation omitted). Defendants attempt to make much of the fact that, in both Andrew and Durham, the plaintiffs had reached out to the news media (though in Durham, the plaintiff also reached out to others, including the Governor's Office). That may be. But nothing in this Court's reasoning or broadly-worded holdings in either Andrew or Durham suggests that that fact was somehow dispositive. Nothing in either Andrew or Durham stands for the proposition that only speech to a media organization can qualify for First Amendment protection. And we agree with Justice Stevens that it would be "perverse to fashion a new rule that provides employees with an incentive to voice their concerns publicly," Garcetti, 547 U.S. at 427 (Stevens, J., dissenting)— which is precisely what we would be doing, were we to adopt Defendants' position that exposing serious government misconduct

25

to the news media is protected, but exposing that same misconduct to the Governor's Office, as in this case, by definition is not.

In sum, "it was clearly established in the law of this Circuit" in December 2011 that speech about "serious misconduct in a law enforcement agency[] is protected." Durham, 737 F.3d at 303-04. The district court therefore did not err in denying qualified immunity to Cook and Bralley on this basis.

III.

In their lone argument on appeal, Plaintiffs contend that "Bralley was the final decisionmaker with respect to the employment of the plaintiffs, and that Cook was the final policymaker of the MPD." Appellees' Br. at 47. Accordingly, per Plaintiffs, the Town of Mocksville is liable for Cook's and Bralley's unconstitutional retaliatory actions, and the district court erred in holding otherwise and dismissing their claims against the town. This issue is, however, not properly before us.

"With a few exceptions not relevant here, this court has jurisdiction of appeal from 'final decisions' only." Cram v. Sun Ins. Office, Ltd., 375 F.2d 670, 673 (4th Cir. 1967). Generally, "a district court order is not 'final' until it has resolved all claims as to all parties." Am. Petroleum Inst. v.

26

<u>Cooper</u>, 718 F.3d 347, 353-54 n.7 (4th Cir. 2013) (quoting <u>Fox v. Baltimore City Police Dep't</u>, 201 F.3d 526, 530 (4th Cir. 2000)).

The district court's disposal only of Plaintiffs' claims against the Town of Mocksville does not constitute a final judgment. It is, therefore, not generally reviewable. <u>See</u> <u>Cram</u>, 375 F.2d at 673 (noting that "a summary judgment as to one of the parties is no exception to the rule" of finality and an appeal thereof "must therefore be dismissed").

A potential avenue for appealability nevertheless exists: Civil Procedure Rule 54(b) "provides a vehicle by which a district court can certify for immediate appeal a judgment that disposes of fewer than all of the claims or resolves the controversy as to fewer than all of the parties." <u>Fox</u>, 201 F.3d at 530. Under Rule 54, the district court "may direct entry of a final judgment as to one or more, but fewer than all, claims or parties"—but "only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b).

Here, however, the record does not reflect that the district court entered judgment for the Town of Mocksville under Rule 54. On the contrary, the district court made plain in its January 2014 order that "final judgment has not been entered as to any party . . . pursuant to Rule 54." <u>Hunter</u>, 2014 WL

27

881136, at *2. Accordingly, we must refrain from considering this issue.[4]

### IV.

For the reasons explained above, the judgments of the district court, to the extent they are reviewable at this juncture, are

AFFIRMED.

---

[4] Had the district court come down the other way on the issue, moreover, it still would have been unreviewable. See Swint v. Chambers Cnty. Comm'n, 514 U.S. 35, 43 (1995) (holding that a county commission's assertion that the sheriff was not the county policymaker was a defense to liability, not an immunity from suit, and that denial of summary judgment for the county commission was thus not immediately appealable).

NIEMEYER, Circuit Judge, dissenting:

I would grant qualified immunity to Police Chief Robert Cook and Town Manager Christine Bralley because it was not clearly established at the time that Chief Cook fired the plaintiff-officers that the officers had complained to the North Carolina Governor's Office <u>as citizens</u>, rather than <u>as employees</u>. If the officers had complained as employees, "the Constitution does not insulate their communications from employer discipline." <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 421 (2006).

In December 2011, Police Officers Kenneth L. Hunter, Rick A. Donathan, and Jerry D. Medlin of the Mocksville Police Department in Mocksville, North Carolina, used a disposable telephone to call the Governor's Office to anonymously report perceived corruption and misconduct within the Police Department, including corruption by Chief Cook, and to request that an investigation be initiated. Two weeks later, after Chief Cook allegedly learned of the call and consulted with Town Manager Bralley, he terminated the three officers' employment.

The officers commenced this action under 42 U.S.C. § 1983 against Chief Cook, Town Manager Bralley, and the Town of Mocksville, alleging that the defendants violated their First Amendment rights by terminating their employment in retaliation for their exercise of free speech rights in calling the

29

Governor's Office. They sought compensatory and punitive damages, reinstatement, and injunctive relief against future violations of their rights.

On the defendants' motion for summary judgment, the district court denied Chief Cook and Town Manager Bralley's claim of qualified immunity and granted judgment to the Town of Mocksville, concluding that the officers failed to state a claim for municipal liability. Chief Cook and Town Manager Bralley filed this interlocutory appeal, challenging the district court's denial of their qualified immunity, and the officers cross-appealed the dismissal of their municipal liability claim.

The majority affirms the qualified immunity ruling, concluding that the officers' complaint to the Governor's Office about departmental misconduct was protected by the First Amendment because it was clearly established that the officers were not simply carrying on their "daily professional activities" but rather were speaking as citizens on a matter of public concern. But in reaching this conclusion, the majority fails to identify any controlling precedent that would have informed Chief Cook and Town Manager Bralley that they were acting unlawfully in firing the officers for going over their heads to the Governor's Office to complain about departmental misconduct. The question of whether police officers speak as employees or as citizens when complaining to the Governor's

30

Office about departmental corruption and misconduct was undecided in this circuit -- and has remained so before today -- and the proper application of relevant principles is murky at best. Therefore, the relevant case law was not clearly established at the time of the defendants' conduct. In such circumstances, Chief Cook and Town Manager Bralley are entitled to qualified immunity, which shields government officials from suits for damages when acting in their personal capacity unless (1) they violate a statutory or constitutional right (2) that was "clearly established at the time of the challenged conduct." Lane v. Franks, 134 S. Ct. 2369, 2381 (2014) (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)) (internal quotation marks omitted). Accordingly, I would reverse and remand with instructions to grant Chief Cook and Town Manager Bralley qualified immunity.[*]

In considering whether a right was clearly established at the time of the challenged conduct, courts are guided by three principles. First, "as long as [an official's] actions could reasonably have been thought consistent with the rights [he is]

---

[*] I agree with the majority that we do not have subject matter jurisdiction to address the officers' cross-appeal of the dismissal of their municipal liability claim for failure to demonstrate that either Chief Cook or Town Manager Bralley was the final policymaker for the Town.

alleged to have violated," he is entitled to qualified immunity. Anderson v. Creighton, 483 U.S. 635, 638 (1987). Second, while an official may be denied qualified immunity without "the very action in question ha[ving] previously been held unlawful," id. at 640, "existing precedent must have placed the statutory or constitutional question beyond debate," al-Kidd, 131 S. Ct. at 2083 (emphasis added). Third, existing precedent is limited to "the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999) (quoting Jean v. Collins, 155 F.3d 701, 709 (4th Cir. 1998) (en banc)).

The test for evaluating a First Amendment retaliation claim is well-established and inquires:

> (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's termination decision.

McVey v. Stacy, 157 F.3d 271, 277-78 (4th Cir. 1998). In Garcetti, the Supreme Court refined the test, making clear that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate

32

their communications from employer discipline." 547 U.S. at 421 (emphasis added). Thus, in the wake of Garcetti, the inquiry whether an employee was speaking as a citizen is logically independent from the inquiry whether the employee was speaking on a matter of public concern. See Lane, 134 S. Ct. at 2378-81 (determining first that the employee's speech was "speech as a citizen," id. at 2378, before turning to whether his speech was "speech on a matter of public concern," id. at 2380).

Chief Cook and Town Manager Bralley concede that the law was clearly established by December 2011 that the officers, when complaining about criminal misconduct in their department, were speaking on a matter of public concern and that their interest in so speaking outweighed the Police Department's interest in providing effective and efficient services to the public. They contend, however, that the officers' "duties and obligations as law enforcement officers included the reporting and investigation of misconduct," and therefore that the officers "were speaking as employees rather than citizens" when they complained to the Governor's Office about such misconduct in the Police Department. Recognizing the officers' argument to the contrary, Chief Cook and Town Manager Bralley maintain that, "[a]t a minimum," the state of the law in this circuit was unsettled as to whether officers, complaining as these officers did, speak as employees or as citizens.

33

I agree with the defendants that, as of December 2011, the law was not clearly established -- nor, indeed, has it been at any time before now -- that a police officer complaining to the Governor's Office of departmental corruption involving his police chief speaks as a citizen. Given the lack of relevant authority, it was entirely reasonable for Chief Cook and Town Manager Bralley to have concluded that the officers were complaining as employees in the course of their official duties when making their complaints.

In deciding otherwise, the majority relies on two decisions -- Andrew v. Clark, 561 F.3d 261 (4th Cir. 2009), and Durham v. Jones, 737 F.3d 291 (4th Cir. 2013). But those cases only go so far as to conclude unremarkably that exposing corruption within a police department is a matter of public concern -- a proposition with which Chief Cook and Town Manager Bralley agree. Neither case addresses the independent inquiry of whether the officers were speaking as citizens when reporting departmental corruption for investigation.

In Andrew, a police officer alleged that his First Amendment rights were violated when he was fired for leaking to the press an internal memorandum that he had written regarding whether the police department properly handled an investigation of an officer-involved shooting. Andrew, 561 F.3d at 263. In an apparent effort to insulate his claim from the argument that

34

he spoke as an employee, Andrew alleged in his complaint (1) that he "was not under a duty to write the memorandum as part of his official responsibilities"; (2) that "[h]e had not previously written similar memoranda after other officer-involved shootings"; (3) that he "would not have been derelict in his duties . . . , nor would he have suffered any employment consequences, had he not written the memorandum"; (4) that the police commissioner characterized the memorandum as "unauthorized" and ignored it; and (5) that he was not responsible for investigating officer-involved shootings and did not work with or have control over the units that bore that responsibility. Id. at 264. The defendants replied that because Andrew was the district commander, he was required to write reports for all shootings within his district. Id. at 266-67 & n.1. In reversing the district court's grant of qualified immunity, we concluded that "the question whether the Andrew Memorandum was written as part of his official duties was a disputed issue of material fact that [could not] be decided on a motion to dismiss pursuant to Rule 12(b)(6)." Id. at 267 (emphasis added); see also id. ("At this stage of the proceedings in this matter, we must conclude that there is 'room for serious debate' regarding whether Andrew had an official responsibility to submit a memorandum . . ."). Thus, in the context of that factual dispute, Andrew provides no guidance

35

regarding when a police officer speaks as a citizen rather than as an employee.

Durham is no different. There, we affirmed the district court's denial of qualified immunity to a sheriff who fired his deputy for sending a packet of materials describing corruption within the sheriff's office to the media and various state officials. Durham, 737 F.3d at 294. In doing so, we focused on whether the deputy sheriff spoke on a matter of public concern and on whether his interest in speaking outweighed his employer's interest in maintaining an effective work environment. Id. at 298-304. We said nothing about whether the deputy sheriff had been speaking as a citizen, an issue that the sheriff never raised in his brief. See Br. of Appellant, Durham, 737 F.3d 291 (No. 12-2303), 2013 WL 551533 (arguing exclusively that the materials did not pertain to a matter of public concern and that the interest of the sheriff's office in maintaining an efficient and effective law enforcement agency outweighed any interest that the deputy sheriff claimed in disseminating the materials).

Not only did Andrew and Durham not address whether police officers speak as citizens when reporting corruption to a state agency, but the facts of those cases also render them decidedly distinguishable from the case before us. Whereas the terminated officers in those cases had leaked information to members of the

media, either exclusively (Andrew) or in tandem with a distribution to a broad spectrum of public officials (Durham), the terminated officers in this case reported the corruption exclusively to a single governmental agency that could have been thought to have supervisory or investigatory responsibility over the Police Chief and the Town Manager. In light of this factual distinction, it can hardly be said that existing precedent "placed the . . . constitutional question beyond debate," al-Kidd, 131 S. Ct. at 2083 (emphasis added).

The majority maintains that it would be "perverse" to hold that employee speech regarding serious governmental misconduct is protected when made publicly but not when made to the Governor's Office. Ante, at 25 (quoting Garcetti, 547 U.S. at 427 (Stevens, J., dissenting)) (internal quotation marks omitted). Maybe so, but that is not the proper inquiry. Rather, the question is whether Durham and Andrew made it such that a reasonable official would have understood that the individual defendants' conduct violated the plaintiffs' First Amendment rights. See Owens v. Balt. City State's Attorney's Office, 767 F.3d 379, 398 (4th Cir. 2014), cert. denied, No. 14-887, 2015 WL 275612 (U.S. Apr. 27, 2015). To the extent that our prior case law suggested that a law-enforcement officer speaks as a citizen when reporting corruption and misconduct to the media for publication, it would not necessarily have been

37

apparent to a reasonable official that such an officer speaks as a citizen when making such a report to a governmental agency for investigation.

"Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). Here, not only was there no authority in this circuit holding that the defendants' conduct was unlawful, but also there was no precedent regarding when a police officer speaks as a citizen rather than as an employee. Thus, Chief Cook and Town Manager Bralley were left to speculate about and guess whether terminating the employment of Officers Hunter, Donathan, and Medlin would violate their First Amendment rights. Because those public officials are not liable for incorrect guesses, I would grant them qualified immunity and reverse the district court's ruling denying that immunity.