DIANA GRIBBON MOTZ, Circuit
Judge, concurring in the judgment:
For the reasons that follow, I agree that qualified immunity shields Chief Caldwell from liability in this case. I write separately because I cannot join the majority’s rationale for so holding.
I.
Garcetti v. Ceballos, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), instructs that the First Amendment does not protect statements that public employees make “pursuant to their official duties.” Id. at 421, 126 S.Ct. 1951. As the Supreme Court has explained, “[t]he critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee’s duties, not whether it merely concerns those duties.” Lane v. Franks, — U.S. -, 134 S.Ct. 2369, 2379, 189 L.Ed.2d 312 (2014). To answer that question, a court engages in a practical inquiry “into the employee’s ‘daily professional activities’ to discern whether the speech at issue occurred in the normal course of those ordinary duties.” Hunter v. Town of Mocksville, 789 F.3d 389, 397 (4th Cir. 2015) (emphasis added) (quoting Garcetti, 547 U.S. at 422, 126 S.Ct. 1951). This inquiry focuses on the employees’ actual, ordinary job duties. See, e.g., Andrew v. Clark, 561 F.3d 261, 267 (4th Cir. 2009) (emphasizing the materiality of whether a police officer “had an official responsibility to submit a memorandum regarding” a police shooting).
In this case, Chief Caldwell forced Detectives Crouse and Winningham to resign because they brought a citizen complaint form to James Berkeley and encouraged him to file a complaint about the treatment he received from Lt. Roach. Thus, the controlling question is whether this speech by Crouse and Winningham “is itself ordinarily within the scope of [their] duties.” Lane, 134 S.Ct. at 2379. The majority apparently believes that it was, but the record does not contain a shred of evidence to support that view.
*588 Indeed, it is undisputed that it was not Crouse and Winningham’s job to hand out citizen complaint forms or to encourage citizens to take action against a superior officer. There is no evidence that any officers in Moncks Corner have such duties. Moreover, Crouse and Winningham were not assigned to the Berkeley incident in any capacity, and they went to Berkeley’s home during their lunch break. They certainly were not authorized to bring a complaint form to Berkeley or to encourage him to complain about Lt. Roach. In fact, they lost their jobs precisely because they did this. As the captain who oversaw the investigation of Crouse and Winningham explained in his deposition, the detectives were forced to resign because they went outside “the chain of command.” J.A. 862.
Chief Caldwell’s deposition testimony also substantiates that Crouse and Winningham spoke well outside the bounds of their official duties. The Chief was asked to explain why Frankie Thompson, an officer who purportedly conspired with Crouse and Winningham against Lt. Roach, received only a three-day suspension for his role in the plot. J.A. 262. The Chief responded that if Thompson had gone with Crouse and Winningham to talk to Berkeley, he would have forced Thompson to resign too. J.A. 687. The reason why speaks volumes. According to Chief Caldwell, going to Berkeley with a complaint form and encouraging Berkeley to take action against Lt. Roach was “one of the most disloyal acts in my 40 year career. I’ve never had something like that happen.” J.A. 687 (emphasis added).
This evidence compels the conclusion that Crouse and Winningham spoke and acted outside the scope of their ordinary duties. This is doubly so when we view the evidence in the light most favorable to Crouse and Winningham, as we must on summary judgment even when applying the qualified immunity doctrine. See Tolan v. Cotton, — U.S.-, 134 S.Ct. 1861, 1863, 188 L.Ed.2d 895 (2014) (per curiam); Hunter, 789 F.3d at 393. Garcetti teaches that if Crouse and Winningham acted pursuant to their official duties, there must have been some job duty they were supposedly carrying out. But the record in this case, viewed in whatever light you please, shows that there was no such duty. It also shows that Chief Caldwell did not believe, and could not have reasonably believed, otherwise.
The majority engages in no meaningful inquiry into the detectives’ official duties. Instead, it relies almost entirely on the fact that Berkeley easily identified Crouse and Winningham as police officers. See Maj. Op. at 585-87. In effect, the majority holds that whether public employees speak “pursuant to their official duties” depends on whether their audience can tell what their job is. But that is not the law. Public employees do not lose their First Amendment rights simply because their audience knows, or can guess, where they work. The majority’s conclusion to the contrary has no root in Garcetti or its progeny.
II.
Even though the record is clear that Detectives Crouse and Winningham spoke as citizens on a matter of clear public concern, namely, police brutality, I agree that Chief Caldwell enjoys qualified immunity from their claims in this lawsuit.
To determine the Chiefs entitlement to qualified immunity, we balance the detectives’ interest in speaking out against the Chiefs interest in maintaining efficient delivery of the police department’s public service. See Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). When balancing these interests, we must consider “the manner, time, and *589 place of the employee’s expression,” as well as “the context in which the dispute arose.” Rankin v. McPherson, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). Qualified immunity applies in this case because no precedent clearly established that this balance favored the detectives.
First Amendment protections for public employees promote transparency and accountability by allowing employees to speak out about misconduct and abuses the public might otherwise never uncover. See Lane, 134 S.Ct. at 2377; City of San Diego v. Roe, 543 U.S. 77, 82, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (per curiam). The need for these protections is particularly acute in police departments.
Police misconduct and abuses of power often involve matters of life and death. And police departments are particularly vulnerable to the temptation to circle the wagons and “wall themselves off from public scrutiny and debate.” Liverman v. City of Petersburg, 844 F.3d 400, 413 (4th Cir. 2016). In an ideal world, police misconduct and abuses would be discovered and disciplined according to established procedures. Sadly, this is not our world. Serious allegations of misconduct sometimes go unanswered, and ' officers who abuse their power sometimes go undisciplined. By permitting officers to speak out in these cases, the First Amendment allows the public to hold a police department accountable when the normal process fails.
However, the need for such incentives is far less compelling when a police department is not even given a chance to review or investigate an incident. This is especially true when officers rush to speak out about an incident of which they have no personal knowledge.
Even viewing the evidence in the light most favorable to the detectives, that is what happened here. J.A. 228, 234, 1114-1128. The Berkeley incident occurred late on Friday, October 4, 2013. On Monday morning, Crouse and Winningham learned about the incident third-hand. J.A. 1115— 17. They then reviewed the police report and heard Lt. Roach bragging about how he had subdued Berkeley. J.A. 1118-20. Although Crouse and Winningham did not speak to any of the other officers present at the scene and did not conduct any other significant follow-up, they concluded that Lt. Roach’s use of force was excessive. J.A. 1120-23. They went to Berkeley’s house the very next day, before the police department had any real opportunity to review Lt. Roach’s use of force or begin its own investigation. J.A. 1126-28, 228, 234. Crouse and Winningham did not even wait for Berkeley to complain that he had been mistreated. Instead, they took it upon themselves to begin the process for removing Lt. Roach.
We must weigh these facts against the extent to which Chief Caldwell reasonably apprehended disruption from the detectives’ speech. See Maciariello v. Sumner, 973 F.2d 295, 300 (4th Cir. 1992). Police departments have good reason to fear disruption in cases like this. Effective policing requires an effective chain of command, and that is undermined when subordinates try to get their superiors fired at the drop of a hat. More importantly, a police department’s ability to protect the public depends on the public’s trust that the police department will use its powers responsibly and 'adequately discipline officers who do not. Officers risk eroding that trust when they go to the public with unsubstantiated allegations of abuse or misconduct without allowing internal review and investigations to unfold. No one is well served when officers rush to try their superiors in the court of public opinion.
*590 Under these circumstances, a reasonable officer in Chief Caldwell’s position could conclude that the department’s interest outweighed that of the detectives. It was not “beyond debate” which way the scales tilted. Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). At best, it was a gray area to which qualified immunity applies.
This is not to say that qualified immunity applies whenever police officers speak out about misconduct by their superiors. For example, it is clearly established law in this circuit that police officers may speak out about a department’s efforts to cover up an incident of excessive force. Durham v. Jones, 737 F.3d 291, 303 (4th Cir. 2013). Our case law also establishes that local police officers may report their superiors’ alleged corruption to state law enforcement. Hunter, 789 F.3d at 393-95, 401-02. Officers may even do these things quietly or anonymously — without going to the press or grabbing the proverbial megaphone. See id. at 401-02 (holding that an anonymous phone call to state authorities was protected and rejecting the argument that “only speech to a media organization can qualify for First Amendment protection”); Cromer v. Brown, 88 F.3d 1315, 1327-29 (4th Cir. 1996) (holding that the balancing test “clearly” favored officers’ circulation of an anonymous letter because they “moved quietly and did not try to provoke a public confrontation”).
However, when officers rush to have a superior officer fired for excessive use of force, without giving the department a chance to conduct its own review or investigation, it is not clearly established law that their interest in telling private citizens to take action against their superiors outweighs the department’s interest in preventing disruption. Accordingly, I concur with the majority that Chief Caldwell is entitled to qualified immunity.