**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1039**

RICHARD CROUSE; GEORGE T. WINNINGHAM,

Plaintiffs - Appellants,

v.

TOWN OF MONCKS CORNER; JAMES CHAD CALDWELL, Chief of Police, Moncks Corner Police Department,

Defendants - Appellees.

Appeal from the United States District Court for the District of South Carolina, at Charleston.  C. Weston Houck, Senior District Judge.  (2:14-cv-00438-CWH)

Argued:  December 7, 2016                    Decided:  February 15, 2017

Before WILKINSON, MOTZ, and FLOYD, Circuit Judges.

Affirmed by published opinion.  Judge Wilkinson wrote the opinion, in which Judge Floyd joined.  Judge Motz wrote a separate opinion concurring in the judgment.

**ARGUED:** Shon Robert Hopwood, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellants.  Christopher Wofford Johnson, GIGNILLIAT, SAVITZ & BETTIS, L.L.P., Columbia, South Carolina, for Appellees. **ON BRIEF:** Steven H. Goldblatt, Appellate Litigation Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C.; Marybeth Mullaney, Mount Pleasant, South Carolina; Jennifer Munter Stark, Mount Pleasant, South Carolina, for Appellants.

Derwood L. Aydlette, III, GIGNILLIAT, SAVITZ & BETTIS, L.L.P., Columbia, South Carolina, for Appellees.

WILKINSON, Circuit Judge:

Appellants are two police officers who appeal their dismissal from the force, claiming that it was in retaliation for the exercise of their First Amendment rights. The district court granted qualified immunity to the police chief on the ground that it was unclear whether the officers had acted as private citizens or government employees. For the reasons that follow, we affirm the judgment.

## I.

Plaintiffs Richard Crouse and George Winningham were detectives in the Moncks Corner Police Department until they were forced to resign in October 2013. Winningham was a corporal, and he reported directly to Crouse, a sergeant. Crouse, in turn, reported to Lieutenant Michael Roach. Roach's supervisors were Captain Mark Murray and, in charge of the entire department, Chief Chad Caldwell.

Crouse and Winningham had "good" relationships with Roach when they began to work for him, but those relationships deteriorated over time. J.A. 980, 1091. Crouse and Winningham complained about Roach's management style, his treatment of criminal suspects, and his showing the officers inappropriate pictures. Chief Caldwell agreed that Roach could be "argumentative" and "abrasive." J.A. 608. Another officer described Roach as "aggressive," but she felt that his approach as a detective "tend[ed] to work." J.A. 1323. Crouse discussed his complaints about Roach with both Captain Murray and

Chief Caldwell, but until October 2013, these complaints did not include accusations of excessive use of force.[1]

The sequence of events leading to Crouse's and Winningham's resignations began with the arrest of James Berkeley on October 4, 2013. Berkeley had fallen asleep in his car in a Wal-Mart parking lot after taking the wrong medication. His three sons in the car could not wake him and alerted Wal-Mart security, who called the police. Roach was the first to arrive on the scene. Berkeley claims that Roach pulled him from the car and threw him to the ground, while Roach says that he pulled Berkeley out of the car to wake him up. A second Moncks Corner police officer, Shawnda Winder, arrived to find Berkeley standing outside of his car arguing with Roach. While she did not see the initial encounter, Winder felt that Roach was being rude to Berkeley and making the situation more difficult.

Roach and Winder learned that Berkeley had an outstanding arrest warrant and placed him under arrest in the back of Winder's patrol car. While Berkeley was in the patrol car, he and Roach began to argue again. Roach tried to shut the car door, but Berkeley's leg prevented it from closing. Roach tried to shut the door again and then used a knee strike to try to force Berkeley's leg into the car. Berkeley claims the knee strike hit his groin, while Roach claims the strike was to Berkeley's outer thigh. After the knee

---

[1] The plaintiffs also point to an incident at a high school reunion, an argument Roach and Winningham had over a duty assignment, and an altercation between Roach and his brother. It is not clear that Chief Caldwell even knew of the first two alleged incidents, and Roach's behavior, while allegedly rude and truculent, speaks more to an argumentative personality than to any harm remotely relevant to this case.

strike, Berkeley jumped out of the patrol car. Roach and Winder tried to push Berkeley back into the patrol car. Another officer on the scene, Officer Dozier, was able to force Berkeley onto the ground. Roach and Dozier held Berkeley down, and Roach threatened to use his Taser if Berkeley resisted further. Berkeley calmed down, and Dozier and Winder helped him back into the patrol car.

Crouse and Winningham learned about this incident the following Monday, October 7, 2013. That morning, another officer told Crouse and Winningham that he had heard that Roach had "kneed Mr. Berkeley in the" groin. J.A. 1116. Crouse and Winningham read the incident report and viewed pictures of Berkeley's injuries. Crouse discussed his concerns about the incident with Captain Murray.

The next day, Crouse and Winningham decided to talk to Berkeley. During their lunch, Crouse and Winningham drove to Berkeley's house. They were in plainclothes and driving an unmarked car, but their guns and badges were visible. After a few minutes sitting outside the house, they saw Berkeley and initiated a conversation with him. Crouse and Winningham encouraged him to file a complaint about Roach. They told him that other officers supported his version of the story, and Winningham suggested that Berkeley get an attorney. Crouse also handed Berkeley a form that the police department prepared for citizens to submit complaints about police officers. These forms were freely available in the police station and were distributed by clerical staff and police officers.

Crouse and Winningham made several efforts to conceal their visit to Berkeley. Crouse used a separate piece of paper to hold the citizen complaint form, ensuring that his fingers never touched the form that he gave to Berkeley. Crouse told Berkeley to

5

pretend not to recognize the officers if they saw each other in the police station. After they left, the two officers initially agreed to say that Berkeley had flagged them down but ultimately decided to tell the truth if they were questioned.

Despite the officers' entreaties to Berkeley not to discuss their visit, he spoke with Officer Winder that day. He told her that a Moncks Corner police officer had encouraged him to sue Roach and the Moncks Corner Police Department. Winder informed Chief Caldwell, who assigned Lieutenant Mark Fields to investigate the entire incident—both Berkeley's claim of excessive use of force and the visit by the mysterious officers.

Fields began his investigation by reviewing the incident report and interviewing some of the officers who were present at Berkeley's arrest. On October 15, 2013, Fields interviewed Berkeley about both his arrest and the officers who had come by his house. Based on Berkeley's physical description of the two officers, Fields suspected that they were Crouse and Winningham.

After reporting his suspicions to Chief Caldwell, Fields interviewed Crouse and Winningham separately. Both admitted to speaking with Berkeley and gave written statements describing what they had done. Fields told Chief Caldwell, who "was absolutely outraged." J.A. 687. Caldwell instructed Captain Murray to give Crouse and Winningham the opportunity to resign. Murray told Crouse and Winningham that if they did not resign, they would be terminated, and both officers resigned.

Fields's investigation into Berkeley's accusation of excessive force continued. After Fields finished his investigation, Chief Caldwell requested that the South Carolina Law Enforcement Division investigate the incident. That investigation ended in March

6

2014, when the local prosecutor determined that the evidence did not support seeking criminal charges against Roach for excessive use of force.

On February 19, 2014, Crouse and Winningham filed suit against Chief Caldwell and the Town of Moncks Corner. Relevant here, they raised a claim under 42 U.S.C. § 1983, arguing that their forced resignations had been an unconstitutional retaliation for the exercise of their First Amendment rights. At a hearing, the district court held that Chief Caldwell was entitled to qualified immunity on the First Amendment claim. The court reasoned that it was not clearly established law that Crouse and Winningham were acting as private citizens when they spoke to Berkeley and that, under *Garcetti v. Ceballos*, 547 U.S. 410 (2006), acting as a private citizen was a necessary element of a First Amendment retaliation claim. The parties agreed to dismiss without prejudice two remaining claims.[2] Crouse and Winningham now appeal the grant of summary judgment on their First Amendment claim.

II.

It is well established that government workers do "not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of [their] employment."

---

[2] The district court initially declined to dismiss these two claims, which dealt with Crouse and Winningham's wages, noting that they were factually distinct from the other issues the court was considering. In its final order, however, the district court dismissed the two wage claims without prejudice pursuant to an agreement of the parties, and Crouse and Winningham have re-filed the claims as a new and separate action. The dismissal without prejudice was the functional equivalent of severing the claims, creating "two discrete, independent actions, which then proceed as separate suits for the purpose of finality and appealability." *Gaffney v. Riverboat Servs. Of Ind., Inc.,* 451 F.3d 424, 441 (4th Cir. 2006). This court thus has jurisdiction to hear the appeal.

*City of San Diego v. Roe,* 543 U.S. 77, 80 (2004) (per curiam). Underlying this rule is both the government employee's interest, "as a citizen, in commenting upon matters of public concern," *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568 (1968), and the community's interest in hearing those employees' "informed opinions on important public issues." *Roe*, 543 U.S. at 82. Nonetheless, "a governmental employer may impose certain restraints on the speech of its employees . . . that would be unconstitutional if applied to the general public." *Id.* at 80. A public agency has an interest "in promoting the efficiency of the public services it performs through its employees," *Pickering*, 391 U.S. at 568, and allowing all employment decisions to be subject to "intrusive oversight by the judiciary in the name of the First Amendment" would compromise an agency's operations. *Connick v. Myers,* 461 U.S. 138, 146 (1983).

When a government employee claims that he was disciplined because of his speech, we use a three-prong test to determine if the employee's rights under the First Amendment were violated. *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998). The first prong asks whether the employee "was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest." *Id.* This prong can in turn be divided into two inquiries: whether the speech was made as a citizen or pursuant to the employee's duties, *Garcetti,* 547 U.S. at 421, and whether the content of the speech addressed "a matter of interest to the community" rather than "complaints over internal office affairs." *Connick,* 461 U.S. at 149. If the speech was made as a citizen and addressed a matter of public concern, the second prong of the test requires a court to balance the interest of the employee in speaking freely with the interest of the

8

government in providing efficient services. *Pickering*, 391 U.S. at 568. The *Pickering* balancing test demands a "particularized" inquiry into the facts of a specific case. *Connick*, 461 U.S. at 150. If a court determines that the employee's interest outweighed the government employer's interest, the third prong requires a determination that the employee's speech caused the disciplinary action. *McVey*, 157 F.3d at 277-78. The first two prongs of this test are questions of law, while the third is a factual inquiry. *Brooks v. Arthur*, 685 F.3d 367, 371 (4th Cir. 2012).

Because the first two prongs of the test are questions of law, an employer is entitled to qualified immunity if either prong cannot be resolved under clearly established law. "[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To defeat a qualified immunity defense, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). In order to hold that a right is clearly established, a court does not need to find "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 741. The qualified immunity inquiry depends on the official's "perceptions at the time of the incident in question." *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994).

9

We review de novo a district court's grant of summary judgment based on qualified immunity, viewing the facts in the light most favorable to the nonmoving party. *Smith v. Gilchrist*, 749 F.3d 302, 307 (4th Cir. 2014).

III.

We hold that Chief Caldwell is entitled to qualified immunity on Crouse and Winningham's First Amendment claim.[3] He could reasonably have viewed their conversation with Berkeley as surreptitious conduct designed to foment complaints and litigation against a supervisor with whom they did not get along. Caldwell saw this behavior as a serious threat to the smooth running of the police department and to his own ability to maintain operational control. In fact, it would be difficult for any institution to function when subordinates are engaged in secretive efforts to foment litigation against supervisors with whom they have, for whatever reason, an unfortunate personal chemistry.

We have the "discretion [to] decid[e] which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. Because we find that the law was not clearly

---

[3] Crouse and Winningham also appeal the grant of summary judgment to the Town of Moncks Corner on their First Amendment claim. Moncks Corner would be liable only if a violation occurred pursuant to a municipal policy. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Because Crouse and Winningham protest a single employment decision involving no municipal policy, the town is not liable. *Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro,* 64 F.3d 962, 966 (4th Cir. 1995).

established here, we will not reach the other step in the analysis—whether a constitutional violation actually occurred.

A.

The district court granted Caldwell qualified immunity because it was not clear "from the facts in this case whether [Crouse and Winningham] were speaking as citizens or as government employees." J.A. 1658.

The first inquiry in Crouse and Winningham's case is, again, whether they spoke as "citizen[s] upon matters of public concern" rather than as "employee[s] upon matters only of personal interest." *Connick*, 461 U.S. at 147. The First Amendment does not protect speech made pursuant to a government employee's official duties, even when that speech is upon a matter of public concern. *Garcetti*, 547 U.S. at 421. This reflects the fact that "[e]mployers have heightened interests in controlling speech made by an employee in his or her professional capacity." *Id.* at 422. Government employees do not have a constitutional "right to perform their jobs however they see fit." *Id.*

Determining whether speech was made in the course of an employee's job requires courts "to engage in a 'practical' inquiry into the employee's 'daily professional activities.'" *Hunter v. Town of Mocksville,* 789 F.3d 389, 397 (4th Cir. 2015) (quoting *Garcetti*, 547 U.S. at 422, 424). Whether the employee spoke at his workplace or away from it is not dispositive. *Garcetti*, 547 U.S. at 420. Likewise, courts must look beyond formal job descriptions, and "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties." *Id.* at 424-25.

11

We have encountered only a few cases requiring a detailed inquiry into whether a plaintiff's speech was within the scope of his occupational duties. In *Hunter v. Town of Mocksville*, we held that it was clearly established law in 2011 that police officers did not act pursuant to their official duties when they used a disposable cell phone to make anonymous calls to the governor's office reporting suspected wrongdoing in their police department. *Hunter*, 789 F.3d at 396. The defendant argued that, because all "police officers have a duty to enforce criminal laws" and because the department's manual instructed officers to cooperate with other law enforcement agencies, the plaintiff officers were acting in their capacity as employees. *Id.* at 399. We held, however, that these facts were not sufficient to show that the plaintiffs had acted as police officers rather than as citizens. *Id.*

Here, Crouse and Winningham argue that they spoke as citizens because they were in plainclothes and an unmarked car, they went to Berkeley's house during their unpaid lunch hour, and they were never instructed to speak to Berkeley. On the other hand, though, as Chief Caldwell was aware, Berkeley easily identified Crouse and Winningham as police officers from their guns and badges. In fact, Berkeley so clearly recognized Crouse and Winningham as police officers that he told Winder that very day that Moncks Corner police officers had visited his home. While the lunch hour was unpaid, Crouse and Winningham were expected to be on call at that time and to remain prepared to do their job. And police officers have many interactions with citizens that are not the result of an instruction from their supervisor but are still a part of their official duties. Plaintiffs also gave Berkeley the police department's citizen complaint form. Though these forms

12

were freely available in the police station, Crouse and Winningham's delivery of an official town form lends to their speech an additional connection to their official police duties.

These facts allowed Chief Caldwell to reasonably believe that, as a legal matter, Crouse and Winningham were speaking in their capacity as employees of the police department. Unlike in *Hunter*, Crouse and Winningham were clearly identified as police officers, and their speech more closely resembled their daily duties as police detectives than did the *Hunter* plaintiffs' calls to the governor's office. Chief Caldwell's perception may be debated, but he is not "liable for bad guesses in gray areas." *Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir. 1992). Because it was reasonable for Chief Caldwell to believe that Crouse and Winningham acted in their public roles as police officers, it was reasonable for Caldwell to believe that their speech was not protected, and he is thus entitled to qualified immunity.

B.

Even were we to assume arguendo that Crouse and Winningham spoke as private citizens on a matter of public concern, Chief Caldwell would still be entitled to qualified immunity because, based on the clearly established law at the time of his decision and the facts he knew at that time, the outcome of the *Pickering* balancing test is not "beyond debate." *al-Kidd*, 563 U.S. at 741.

As noted, *Pickering* requires courts to balance "the public employee's interest in speaking on matters of public concern against the government's interest in providing effective and efficient government through its employees." *McVey,* 157 F.3d at 278. "The

13

public's interest in hearing the employee's speech also weighs in the balance." *Brickey v. Hall,* 828 F.3d 298, 304 (4th Cir. 2016). For this inquiry, courts "must take into account the context of the employee's speech . . . and the extent to which it disrupts the operation and mission of the agency." *McVey,* 157 F.3d at 278. The Supreme Court has recognized that "such particularized balancing is difficult." *Connick*, 461 U.S. at 150.

In applying the balance, we first note that Crouse and Winningham's speech was simply not an effort to participate in a larger public dialogue. Their speech was not, for example, a letter to a newspaper, *Pickering,* 391 U.S. at 566, or an online posting contributing to a public discussion of an important issue, *Liverman v. City of Petersburg,* 844 F.3d 400, 409 (4th Cir. 2016), or testimony at a public meeting. *Robinson v. Balog*, 160 F.3d 183, 188 (4th Cir. 1998). Instead, the officers sought to conceal their speech by asking Berkeley to pretend that he had never met them. Moreover, Crouse and Winningham were not providing a particularly informed opinion. They did not witness the alleged use of excessive force and had never, in fact, witnessed Roach using excessive force. J.A. 986. To be sure, "[p]ublic employees do not forfeit the protection of the Constitution's Free Speech Clause merely because they decide to express their views privately rather than publicly." *Cromer v. Brown,* 88 F.3d 1315, 1326 (4th Cir. 1996). Nonetheless, Chief Caldwell could reasonably have surmised that the lessened public interest in the speech meant that his freedom of action was correspondingly broader.

Second, Chief Caldwell was entitled to regard Crouse and Winningham's speech as an outgrowth of their private dissatisfactions with Roach. This court has held, in connection with the *Pickering* balance, that "[t]o the extent that a public employee's

14

expression is in furtherance of matters of personal concern, the public employer's burden of showing the predominance of the public's interest in continuing the efficient functioning of a public entity is lessened." *Joyner v. Lancaster*, 815 F.2d 20, 24 (4th Cir. 1987).

Here, Chief Caldwell knew that Crouse and Winningham did not enjoy working under Roach and that their complaints centered on his demeanor and management style. Crouse and Winningham argue that they were concerned more about the police department not responding to Roach's behavior than about their personal issues with him. They point to the three above mentioned incidents prior to Berkeley's arrest for which Roach was not disciplined: Roach's dispute over a duty assignment with Winningham, an incident at Roach's high school reunion, and Roach's altercation with his brother. *See supra* note 1. There is no evidence, however, that Chief Caldwell even knew of the first two incidents until after Crouse and Winningham resigned. And in all events, the alleged incidents lack any claim to materiality: they do not speak to a pattern of excessive force on the job or any failure on the part of Caldwell to discipline serious misconduct. Moreover, Crouse and Winningham went to Berkeley's house the day after learning about his arrest rather than waiting for the police department to investigate the matter, suggesting that they were more concerned with getting Roach in trouble than ensuring an appropriate departmental response. In short, Chief Caldwell was justified in considering any speech here against the backdrop of the ongoing, private dispute between plaintiffs and Roach.

Most critically, Chief Caldwell viewed what happened here as a threat to his ability to manage the police department. We have noted that, as paramilitary organizations, "greater latitude is afforded to police department officials in dealing with dissension in their ranks." *Maciariello*, 973 F.2d at 300. When Chief Caldwell decided to give Crouse and Winningham the opportunity to resign, he was justified in the perception that they had gone behind his back to foment litigation against their own boss. While plaintiffs deny that they told Berkeley to sue the department, it was reasonable for Chief Caldwell to believe that Crouch and Winningham had encouraged Berkeley to do just that, J.A. 620, based on Winningham's admission in his written statement that he told Berkeley to get an attorney and Caldwell's conversations with Winder and Fields about Berkeley's claim that an officer had encouraged him to sue Roach and the department.

The chain of command would be left in tatters if subordinates tried to stir up litigation against supervisors with whom they, for whatever reason, did not get along. And it isn't just police departments. Most public agencies feature multiple levels of supervision. What happened here would undermine the hierarchical structure that even the most admirably collaborative institutions maintain.

IV.

There is no way to balance the competing *Pickering* interests without looking at the facts of a particular case, and no court has managed to sketch out completely clear criteria governing claims of retaliation against employees for the exercise of First Amendment rights. In the absence of clear rules, there must remain room for the judgment of those officials to whom responsibility has been entrusted and accompanying

16

accountability has been required. Chief Caldwell could reasonably have believed that Crouse and Winningham were acting as police officers rather than private citizens when they visited Berkeley. Moreover, given Crouse and Winningham's ongoing disputes with Roach, their efforts to conceal their speech, and the challenge their conduct, if not addressed, posed to police department operations, Chief Caldwell could reasonably have viewed the department's interest in maintaining discipline as paramount in the *Pickering* balance. Because his judgments were reasonable ones, Chief Caldwell is entitled to qualified immunity. The district court's grant of summary judgment is therefore

*AFFIRMED.*

17

DIANA GRIBBON MOTZ, Circuit Judge, concurring in the judgment:

For the reasons that follow, I agree that qualified immunity shields Chief Caldwell from liability in this case. I write separately because I cannot join the majority's rationale for so holding.

I.

*Garcetti v. Ceballos*, 547 U.S. 410 (2006), instructs that the First Amendment does not protect statements that public employees make "pursuant to their official duties." *Id.* at 421. As the Supreme Court has explained, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014). To answer that question, a court engages in a practical inquiry "into the employee's 'daily professional activities' to discern *whether the speech at issue occurred in the normal course of those ordinary duties.*" *Hunter v. Town of Mocksville*, 789 F.3d 389, 397 (4th Cir. 2015) (emphasis added) (quoting *Garcetti*, 547 U.S. at 422). This inquiry focuses on the employees' actual, ordinary job duties. *See, e.g.*, *Andrew v. Clark*, 561 F.3d 261, 267 (4th Cir. 2009) (emphasizing the materiality of whether a police officer "had an official responsibility to submit a memorandum regarding" a police shooting).

In this case, Chief Caldwell forced Detectives Crouse and Winningham to resign because they brought a citizen complaint form to James Berkeley and encouraged him to file a complaint about the treatment he received from Lt. Roach. Thus, the controlling question is whether this speech by Crouse and Winningham "is itself ordinarily within

18

the scope of [their] duties." *Lane*, 134 S. Ct. at 2379. The majority apparently believes that it was, but the record does not contain a shred of evidence to support that view.

Indeed, it is undisputed that it was not Crouse and Winningham's job to hand out citizen complaint forms or to encourage citizens to take action against a superior officer. There is no evidence that any officers in Moncks Corner have such duties. Moreover, Crouse and Winningham were not assigned to the Berkeley incident in any capacity, and they went to Berkeley's home during their lunch break. They certainly were not authorized to bring a complaint form to Berkeley or to encourage him to complain about Lt. Roach. In fact, they lost their jobs precisely because they did this. As the captain who oversaw the investigation of Crouse and Winningham explained in his deposition, the detectives were forced to resign because they went outside "the chain of command." J.A. 862.

Chief Caldwell's deposition testimony also substantiates that Crouse and Winningham spoke well outside the bounds of their official duties. The Chief was asked to explain why Frankie Thompson, an officer who purportedly conspired with Crouse and Winningham against Lt. Roach, received only a three-day suspension for his role in the plot. J.A. 262. The Chief responded that if Thompson had gone with Crouse and Winningham to talk to Berkeley, he would have forced Thompson to resign too. J.A. 687. The reason why speaks volumes. According to Chief Caldwell, going to Berkeley with a complaint form and encouraging Berkeley to take action against Lt. Roach was "one of the most disloyal acts in my 40 year career. *I've never had something like that happen.*" J.A. 687 (emphasis added).

19

This evidence compels the conclusion that Crouse and Winningham spoke and acted outside the scope of their ordinary duties. This is doubly so when we view the evidence in the light most favorable to Crouse and Winningham, as we must on summary judgment even when applying the qualified immunity doctrine. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam); *Hunter*, 789 F.3d at 393. *Garcetti* teaches that if Crouse and Winningham acted pursuant to their official duties, there must have been some job duty they were supposedly carrying out. But the record in this case, viewed in whatever light you please, shows that there was no such duty. It also shows that Chief Caldwell did not believe, and could not have reasonably believed, otherwise.

The majority engages in no meaningful inquiry into the detectives' official duties. Instead, it relies almost entirely on the fact that Berkeley easily identified Crouse and Winningham as police officers. *See* Maj. Op. at 14–16. In effect, the majority holds that whether public employees speak "pursuant to their official duties" depends on whether their audience can tell what their job is. But that is not the law. Public employees do not lose their First Amendment rights simply because their audience knows, or can guess, where they work. The majority's conclusion to the contrary has no root in *Garcetti* or its progeny.

II.

Even though the record is clear that Detectives Crouse and Winningham spoke as citizens on a matter of clear public concern, namely, police brutality, I agree that Chief Caldwell enjoys qualified immunity from their claims in this lawsuit.

To determine the Chief's entitlement to qualified immunity, we balance the detectives' interest in speaking out against the Chief's interest in maintaining efficient delivery of the police department's public service. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). When balancing these interests, we must consider "the manner, time, and place of the employee's expression," as well as "the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Qualified immunity applies in this case because no precedent clearly established that this balance favored the detectives.

First Amendment protections for public employees promote transparency and accountability by allowing employees to speak out about misconduct and abuses the public might otherwise never uncover. *See Lane*, 134 S. Ct. at 2377; *City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam). The need for these protections is particularly acute in police departments.

Police misconduct and abuses of power often involve matters of life and death. And police departments are particularly vulnerable to the temptation to circle the wagons and "wall themselves off from public scrutiny and debate." *Liverman v. City of Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016). In an ideal world, police misconduct and abuses would be discovered and disciplined according to established procedures. Sadly, this is not our world. Serious allegations of misconduct sometimes go unanswered, and officers who abuse their power sometimes go undisciplined. By permitting officers to speak out in these cases, the First Amendment allows the public to hold a police department accountable when the normal process fails.

21

However, the need for such incentives is far less compelling when a police department is not even given a chance to review or investigate an incident. This is especially true when officers rush to speak out about an incident of which they have no personal knowledge.

Even viewing the evidence in the light most favorable to the detectives, that is what happened here. J.A. 228, 234, 1114–1128. The Berkeley incident occurred late on Friday, October 4, 2013. On Monday morning, Crouse and Winningham learned about the incident third-hand. J.A. 1115–17. They then reviewed the police report and heard Lt. Roach bragging about how he had subdued Berkeley. J.A. 1118–20. Although Crouse and Winningham did not speak to any of the other officers present at the scene and did not conduct any other significant follow-up, they concluded that Lt. Roach's use of force was excessive. J.A. 1120–23. They went to Berkeley's house the very next day, before the police department had any real opportunity to review Lt. Roach's use of force or begin its own investigation. J.A. 1126–28, 228, 234. Crouse and Winningham did not even wait for Berkeley to complain that he had been mistreated. Instead, they took it upon themselves to begin the process for removing Lt. Roach.

We must weigh these facts against the extent to which Chief Caldwell reasonably apprehended disruption from the detectives' speech. *See Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992). Police departments have good reason to fear disruption in cases like this. Effective policing requires an effective chain of command, and that is undermined when subordinates try to get their superiors fired at the drop of a hat. More importantly, a police department's ability to protect the public depends on the public's

22

trust that the police department will use its powers responsibly and adequately discipline officers who do not. Officers risk eroding that trust when they go to the public with unsubstantiated allegations of abuse or misconduct without allowing internal review and investigations to unfold. No one is well served when officers rush to try their superiors in the court of public opinion.

Under these circumstances, a reasonable officer in Chief Caldwell's position could conclude that the department's interest outweighed that of the detectives. It was not "beyond debate" which way the scales tilted. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). At best, it was a gray area to which qualified immunity applies.

This is not to say that qualified immunity applies whenever police officers speak out about misconduct by their superiors. For example, it is clearly established law in this circuit that police officers may speak out about a department's efforts to cover up an incident of excessive force. *Durham v. Jones*, 737 F.3d 291, 303 (4th Cir. 2013). Our case law also establishes that local police officers may report their superiors' alleged corruption to state law enforcement. *Hunter*, 789 F.3d at 393–95, 401–02. Officers may even do these things quietly or anonymously—without going to the press or grabbing the proverbial megaphone. *See id.* at 401–02 (holding that an anonymous phone call to state authorities was protected and rejecting the argument that "only speech to a media organization can qualify for First Amendment protection"); *Cromer v. Brown*, 88 F.3d 1315, 1327–29 (4th Cir. 1996) (holding that the balancing test "clearly" favored officers' circulation of an anonymous letter because they "moved quietly and did not try to provoke a public confrontation").

23

However, when officers rush to have a superior officer fired for excessive use of force, without giving the department a chance to conduct its own review or investigation, it is not clearly established law that their interest in telling private citizens to take action against their superiors outweighs the department's interest in preventing disruption. Accordingly, I concur with the majority that Chief Caldwell is entitled to qualified immunity.