**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 20-1420**

───────────────

MICHAEL BILLIONI,

     Plaintiff – Appellant,

v.

SHERIFF BRUCE BRYANT, individually and in his official capacity as York County Sheriff,

     Defendant – Appellee,

and

YORK COUNTY DETENTION CENTER; YORK COUNTY SHERIFFS OFFICE; YORK COUNTY,

     Defendants,

WCNC-TV INC,

     Respondent,

CONNIE MCMILLAN; CHRISTOPHER PENLAND; JAMES MOORE; LINDSEY HENSON; CAROL SUTTON; FRANCINE WEYERS; JAMES BRACKETT,

     Intervenors.

───────────────

Appeal from the United States District Court for the District of South Carolina, at Rock Hill.  J. Michelle Childs, District Judge.  (0:14-cv-03060-JMC)

───────────────

Argued: March 10, 2021                                                  Decided: May 25, 2021

---

Before WILKINSON, AGEE and FLOYD, Circuit Judges.

---

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Wilkinson joined. Judge Floyd wrote a dissenting opinion.

---

**ARGUED:** Beattie Inglis Butler, BUTLER LAW OFFICE, Charleston, South Carolina, for Appellant. Christopher Wofford Johnson, GIGNILLIAT, SAVITZ & BETTIS, LLP, Columbia, South Carolina, for Appellee. **ON BRIEF:** Jennifer M. Stark, JENNIFER MUNTER STARK LAW OFFICE, Mount Pleasant, South Carolina; Marybeth E. Mullaney, MULLANEY LAW FIRM, Charleston, South Carolina, for Appellant.

---

AGEE, Circuit Judge:

York County Sheriff's Office ("YCSO") employee Michael Billioni disclosed confidential information about an ongoing investigation into an inmate's death to his wife, who worked at a local news station. He then lied to internal investigators about that disclosure, leading Sheriff Bruce Bryant ("Sheriff Bryant") to terminate his employment. Billioni sued Sheriff Bryant under 42 U.S.C. § 1983, alleging he was fired in retaliation for exercising his First Amendment rights. The district court initially held that Billioni's speech was protected under the First Amendment and that his "interest in speaking on a matter of public concern was greater than Sheriff Bryant's interest in preventing workplace disruption." *Billioni v. York Cnty.*, No. 0:14-cv-3060-JMC, 2017 WL 2645737, at *11 (D.S.C. June 20, 2017) ("*Billioni I*"). However, we vacated and remanded that decision because it used an improper legal standard. *See Billioni v. Bryant*, 759 F. App'x 144, 146 (4th Cir. 2019) (per curiam) ("*Billioni II*").

On remand, the district court concluded that Billioni's speech was not protected. Applying the proper standard, the district court found the speech in question caused a reasonable apprehension of disruption in the YCSO and that Sheriff Bryant's interest in avoiding such a disruption outweighed Billioni's circumstantially diminished First Amendment interest. In this appeal, Billioni challenges the district court's balancing of the parties' interests, maintaining that his speech was protected. For the reasons set forth below, we affirm the district court's judgment.

I.

Our prior decision detailed the facts of this case, *see id.* at 146–48, so we assume familiarity with that decision and include here only those facts that are particularly relevant to this appeal. In the early morning hours of October 20, 2013, YCSO detention officers restrained inmate Joshua Grose, who died shortly thereafter. Billioni, who was employed as a Master Control Specialist, was not at the YCSO facility when this incident occurred.

Within a matter of hours, the South Carolina Law Enforcement Division ("SLED") began a full investigation. In that same timeframe, YCSO Internal Affairs initiated a separate investigation to determine if any policy violations occurred related to Grose's death. After conducting preliminary interviews of the officers involved, SLED informed YCSO administrators that the investigation "was still preliminary, but [it] didn't see any cause for alarm," J.A. 538, meaning it "didn't see anybody that had done anything wrong," J.A. 539.

Later that same day, October 20, the YCSO held a press conference on the incident, during which a reporter questioned whether any of the officers involved would be suspended for their actions. In response, the YCSO's public information officer stated, "All our officers, detention officers, did exactly what they were supposed to do last night." J.A. 1247. Billioni, who was watching the press conference, doubted this statement and decided to review the video surveillance footage of the incident during his next shift, which was on the night of October 21 into the morning of October 22.

In reviewing the video surveillance footage, Billioni saw officers attempt to place Grose into a restraining chair to stop him from hurting himself. Billioni then observed an

4

officer strike a noncompliant Grose several times and other officers tase him. The officers were then able to secure Grose.

Billioni did not speak to the officers involved in the incident, review the report, or discuss the events with anyone in the YCSO. Instead, based only on his review of the press conference, the video surveillance footage, and news articles, Billioni concluded that the YCSO's representation at the press conference that the officers involved in the incident acted properly was inaccurate. But Billioni failed to report his concerns to anyone in the YCSO. He made no effort to discuss the matter with the YCSO chain of command, Sheriff Bryant, SLED, the South Carolina Attorney General's Office, the U.S. Department of Justice, or anyone else at that time. Instead, despite knowing that SLED was actively investigating the incident, Billioni told his wife about his impression of what he observed on the surveillance footage upon returning home from his shift on the morning of October 22. His wife, who worked for a local news station, then shared the information with an investigative reporter. Later that same day, October 22, the reporter contacted the YCSO with a Freedom of Information Act request for the surveillance footage and inquired whether it depicted an officer striking Grose multiple times in the head, a questionable allegation considering no such detail had been released to the public. A flurry of media attention over the incident ensued.

Concerned about the reporter's inquiry given SLED's preliminary determination that the officers involved acted appropriately, Sheriff Bryant initiated an internal investigation to uncover the source of the unauthorized disclosure. That same day, October

22, Chief James Arwood and Chief Richard Martin interviewed Billioni, during which he admitted to viewing the surveillance footage, but adamantly denied divulging its contents.

On the following day, October 23, however, Billioni confessed to Chief Arwood and Chief Martin that he had shared the confidential details of the incident with his wife, acknowledging that he had violated the YCSO's policies. They informed Billioni that he could either resign or be fired, and he chose the latter. His termination letter, signed by Sheriff Bryant, explained that he was being fired for breaching the YCSO's confidentiality policy and for lying during the internal investigation into the unauthorized disclosure.

Billioni later filed suit under 42 U.S.C. § 1983, alleging that Sheriff Bryant terminated him in retaliation for exercising his First Amendment rights.[1] In denying Sheriff Bryant's motion for summary judgment, the district court attempted to balance Billioni's speech interest with that of the YCSO in "providing effective and efficient government through its employees," *Billioni I*, 2017 WL 2645737, at *11 (internal quotation marks and citation omitted), and concluded that Billioni's speech did not cause "any disruption" to the YCSO, *id.*

On appeal, we determined that "the district court used the incorrect 'actual disruption' standard instead of the 'reasonable apprehension of disruption' standard" when assessing whether Billioni's speech caused a disruption to the YCSO. *Billioni II*, 759 F. App'x at 150. Accordingly, we vacated the district court's decision and remanded the case to the district court

---

[1] Billioni pursued other claims against additional defendants, which were dismissed and are not the subject of this appeal.

to use the correct legal standard to determine whether the evidence permits a conclusion that a reasonable factfinder could find that Sheriff Bryant reasonably apprehended disruption within the YCSO as a result of Billioni telling his wife about the surveillance video that outweighs Billioni's interest in speaking out about the surveillance video.

*Id.* at 151.

On remand, applying the proper standard, the district court granted Sheriff Bryant's motion for summary judgment, concluding that Billioni's speech was not protected under the First Amendment. Specifically, the district court found that Sheriff Bryant demonstrated a reasonable apprehension of disruption within the YCSO as a result of Billioni's speech and concluded that the interest in avoiding such a disruption outweighed Billioni's interest in conveying the speech in question. The district court denied Billioni's subsequent motion for reconsideration.

Billioni filed a timely appeal as to the district court's grant of summary judgment and denial of reconsideration. The Court has jurisdiction under 28 U.S.C. § 1291 and reviews "the district court's order granting summary judgment de novo, viewing the facts in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Garofolo v. Donald B. Heslep Assocs., Inc.*, 405 F.3d 194, 198 (4th Cir. 2005). And we review the denial of a motion for reconsideration for abuse of discretion *See Pacific Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 402 (4th Cir. 1998).

II.

On appeal, Billioni maintains the validity of his First Amendment retaliatory-discharge claim, asserting that his interest in disclosing internal information about the

7

incident outweighs Sheriff Bryant's reasonable apprehension of disruption within the YCSO. However, his arguments lack merit under our precedent. *See Crouse v. Town of Moncks Corner*, 848 F.3d 576 (4th Cir. 2017). We therefore afford diminished weight to Billioni's interest and conclude that it was outweighed by Sheriff Bryant's reasonable apprehension of disruption. Accordingly, Billioni's First Amendment retaliation claim fails.

A.

To determine if a public employee has a cognizable First Amendment claim for retaliatory discharge, we apply a test derived from *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1983), in which we consider:

> (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's termination decision.

*McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998).

The first and third prongs are not at issue here.[2] The remaining second prong—commonly referred to as "*Pickering* balancing"—"requires a court to balance the interest of the employee in speaking freely with the interest of the government in providing efficient services." *Crouse*, 848 F.3d at 582. The Supreme Court has explained that an inquiry into the specific facts of the specific case is required and that "such particularized

---

[2] During the first appeal, we assumed that Billioni spoke as a citizen upon a matter of public concern and that his speech was a substantial factor in the termination decision.

balancing is difficult." *Connick v. Myers*, 461 U.S. 138, 150 (1983). Specifically, we "must take into account the context of the employee's speech and the extent to which it disrupts the operation and mission of the institution." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 319 (4th Cir. 2006) (internal quotation marks omitted). In measuring disruption, "we do not require the public employer to prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was 'reasonably to be apprehended.'" *Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992) (quoting *Jurgensen v. Fairfax Cnty.*, 745 F.2d 868, 879 (4th Cir. 1984)).

The detrimental effects of disclosing information from an ongoing investigation are "self-evident." *See id.* This has particular resonance when law enforcement agencies are involved because "police officials are entitled to impose more restrictions on speech than other public employers because a police force is paramilitary—discipline is demanded, and freedom must be correspondingly denied." *Brickey v. Hall*, 828 F.3d 298, 304 (4th Cir. 2016) (internal quotation marks and citation omitted). Thus, "greater latitude is afforded to police department officials in dealing with dissension in their ranks." *Maciariello*, 973 F.2d at 300.

## B.

### 1.

This case closely tracks with our recent decision in *Crouse*, which guides our *Pickering* balancing analysis. In *Crouse,* we affirmed the district court's grant of qualified immunity to a police chief following his termination of two officers, who claimed their

termination was in retaliation for exercising their First Amendment rights.[3] 848 F.3d at 580. Those officers, after learning that their supervisor allegedly used excessive force on a suspect, spoke to the suspect before the police department had any meaningful opportunity to conduct an investigation into the allegations. Specifically, without speaking to the officers involved in the encounter and acting only on rumors and the incident report, the officers approached the suspect at his home the day after the incident and "encouraged him to file a complaint about [their supervisor]." *Id.* at 581. When the police chief learned of the officers' actions, he forced them to resign. *Id.* at 582.

The officers filed suit against the police chief and the town, alleging they were terminated in retaliation for exercising their First Amendment rights. *Id.* The district court concluded that the police chief was entitled to qualified immunity, reasoning that "it was not clearly established law that [the officers] were acting as private citizens when they spoke to [the suspect] and that, under *Garcetti v. Ceballos*, 547 U.S. 410 (2006), acting as a private citizen was a necessary element of a First Amendment retaliation claim." *Id.*

On appeal, we agreed that "it was reasonable for [the police chief] to believe that [the officers] acted in their public roles as police officers," not private citizens. *Id.* at 585. However, even assuming *arguendo* that the officers spoke as private citizens, we concluded that the police chief would still be entitled to qualified immunity because the *Pickering*

---

[3] Although we do not address Sheriff Bryant's qualified immunity argument based on our conclusion that Billioni's speech is not protected, *see Billioni II*, 759 F. App'x at 151 ("We can only reach Sheriff Bryant's qualified immunity argument after a determination whether Billioni's speech is protected by the First Amendment."), we nonetheless find *Crouse's* analysis relevant for our purposes.

balancing weighed in favor of the police chief. *Id.* As relevant to Billioni's case, we explained that the complaining officers did not "provid[e] a particularly informed opinion" because "[t]hey did not witness the alleged use of excessive force." *Id.* at 586. Moreover, the officers "went to [the suspect's] house the day after learning about his arrest rather than waiting for the police department to investigate the matter, suggesting that they were more concerned with getting [their supervisor] in trouble than ensuring an appropriate departmental response." *Id.* As such, the police chief "could reasonably have surmised that the lessened public interest in the speech meant that his freedom of action was correspondingly broader." *Id.*

*Crouse's* application of the *Pickering* principles shows that Billioni's interest in conveying the speech in question should be afforded diminished weight in balancing because it was not "a particularly informed opinion" in many respects. *Id.* Like the officers in *Crouse*, Billioni had no first-hand knowledge of the incident and did not speak to the officers involved before disclosing unauthorized information. Indeed, he hastily divulged confidential information barely two days after the occurrence and did so based merely on his review of the press conference,[4] the surveillance footage, and news articles. And most

---

[4] Billioni cites the YCSO's statement during the press conference—*i.e.*, that the officers involved in the incident acted properly—to support his allegation of YCSO misconduct. Said another way, Billioni implies there was a cover-up because the YCSO knew officer misconduct occurred based on the surveillance footage and nonetheless informed the public that its officers acted appropriately. But SLED's preliminary finding of no-misconduct, which it conveyed to the YCSO administration *prior* to the press conference, directly supported the press conference statement on this point. Moreover, the record demonstrates that upon concluding their respective investigations, SLED, the U.S. Department of Justice, and the Solicitor's Office for the 16th Judicial Circuit of South Carolina found no evidence of officer misconduct in Grose's death.

11

critically, Billioni made no effort of any type to direct his concerns up the YCSO chain of command, to SLED, or any other law enforcement agency before sharing confidential details with his wife—and, in turn, the public—despite *knowing* "at that time, that SLED was investigating the incident." J.A. 278; J.A. 285 ("Q: And, again, I mean, SLED's in investigating this thing, right? A: Yes. Q: So, if something wrong is going on, presumably they can figure it out, right? A: Sure."); Oral Argument at 4:41–58, *Billioni v. Bryant* (No. 20-1420) (4th Cir. March 10, 2021), https://www.ca4.uscourts.gov/OAarchive/mp3/20-1420-20210310.mp3 (Billioni's counsel representing that Billioni "did not" report his concerns up the chain of command); *see Cannon v. Vill. of Bald Head Island*, 891 F.3d 489, 499 (4th Cir. 2018) (holding that the *Pickering* balancing did not clearly favor the plaintiff-officers in part because they "did not voice their concerns to Department leadership"); *Maciariello*, 973 F.2d at 300–01 (granting qualified immunity to a police chief after he demoted two officers for conducting their own investigation into a supervisor's alleged misconduct, rather than reporting their suspicions through the chain of command). These facts significantly undercut Billioni's speech interest and suggest that he was "more concerned with getting [Sheriff Bryant and other officers] in trouble than ensuring an appropriate departmental response." *Crouse*, 848 F.3d at 586.

The concurring opinion in *Crouse* also fits well here in conducting the *Pickering* balancing. While "the First Amendment allows the public to hold a police department accountable when the normal process fails," *Crouse*, 848 F.3d at 589 (Motz, J., concurring in the judgment), "the need for such incentives is far less compelling when a police department is not even given a chance to review or investigate an incident. This is

12

especially true when officers rush to speak out about an incident of which they have no personal knowledge," *id.* Indeed, "[o]fficers risk eroding [the public's] trust when they go to the public with unsubstantiated allegations of abuse or misconduct without allowing internal review and investigations to unfold. No one is well served when officers rush to try their [peers] in the court of public opinion." *Id.*

Both the majority and concurring opinions in *Crouse* are directly relevant to this case. Billioni acted on limited and unconfirmed information when disclosing confidential details. He did so knowing that an investigation into the incident was underway and made no effort whatsoever to proceed through the chain of command or any law enforcement channel. We must therefore assign limited weight to Billioni's speech interest.

2.

Balancing Billioni's circumstantially diminished interest with Sheriff Bryant's reasonable apprehension of disruption within the YCSO, we find this analysis weighs decidedly in favor of Sheriff Bryant.

The record reveals a reasonable apprehension of disruption in the YCSO, particularly considering Billioni's speech propelled a frenzy of media attention about unconfirmed facts related to Grose's death. *See* J.A. 508 (Chief Arwood stating that the unauthorized disclosure was a concern because "there was an active investigation and apparently information was being disseminated to the news outlet that had not . . . been confirmed because maybe it wasn't accurate"); J.A. 546 (further testimony that the unapproved release of confidential information was concerning "because someone apparently was divulging information during a death investigation that was ongoing. And

13

a lot of times that can create problems because a person is disseminating not factual information."); J.A. 547 (further testimony that the reporter "said the individual was struck in the head numerous times, which did not occur"). This disruption ballooned into a separate internal investigation into the unauthorized disclosure, undercutting manpower and resources to continue the ongoing investigation into the incident. *See* J.A. 765 (Sheriff Bryant testifying that unauthorized disclosures of confidential information "would be very detrimental to [ongoing] investigation[s] . . . [and] the safety of our operations"). This evidence as to the type and level of reasonably apprehended disruption sufficiently outweighs Billioni's diminished speech interest as a matter of law.

We therefore conclude that Billioni's speech was not protected by the First Amendment. Accordingly, we affirm the district court's grant of summary judgment and denial of Billioni's motion for reconsideration.

III.

For the reasons discussed above, the judgment of the district court is

*AFFIRMED.*

FLOYD, Circuit Judge, dissenting:

I agree with the majority that this case hinges on the second prong of the *Pickering* test, which weighs "the interest of the employee in speaking freely with the interest of the government in providing efficient services." *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582 (4th Cir. 2017) (citing *Pickering v. Bd. of Educ.*, 392 U.S. 563, 568 (1968)). But because I weigh the competing interests differently than the majority, I respectfully dissent.

I.

To conduct the appropriate balancing under *Pickering* prong two, "we must take into account the context of the employee's speech, including the employee's role in the government agency, and the extent to which it disrupts the operation and mission of the agency." *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998) (citing *Rankin v. McPherson*, 483 U.S. 378, 388–91 (1987)). "The public's interest in hearing the employee's speech also weighs in the balance: 'A stronger showing of public interest in the speech requires a concomitantly stronger showing of government-employer interest to overcome it.'" *Brickey v. Hall*, 828 F.3d 298, 304 (4th Cir. 2016) (quoting *McVey*, 157 F.3d at 279 (Murnaghan, J., concurring)).

In my view, this latter concern weighs heavily in the balance of the competing interests at stake in this case. The Supreme Court has long held that "[t]he public . . . has a strong interest in exposing substantial allegations of police misconduct to the salutary effects of public scrutiny." *Waller v. Georgia*, 467 U.S. 39, 47 (1984). If the past several years have shown us anything, it is that communities deserve to know about instances of

15

police misconduct. That information empowers the public to hold the authorities accountable for such acts. Given this strong public interest, I would require YCSO to make a "concomitantly stronger showing of" its interest. *See Brickey*, 828 F.3d at 304 (cleaned up). It has not done so here.

I begin by examining the nature of the speech and Billioni's interest in speaking. Billioni first became aware of Grose's death when he watched a press conference given by Officer Faris, a YCSO public information officer. During that conference, Faris stated that Grose had been booked the prior evening, "was very uncooperative with Detention Center officers and staff," "attempted to drown[] himself in his cell toilet," and "hit his head on his cell wall several times." J.A. 1243. According to Faris, Grose was restrained "for his safety," but "was still very, very combative and kept hitting his head on the back of the . . . restraint chair." *Id.* When officers tried to put Grose in a helmet—again, for his safety—they noticed a laceration, which led them to contact emergency medical services. After the medics left, Grose went into cardiac arrest and later died. Faris provided this timeline of events and then answered questions. Though he explained that "SLED ha[d] been called in" to investigate, he also noted—in response to a question about whether involved officers were being placed on administrative leave—that "[a]ll [the] officers . . . did exactly what they were supposed to do last night." J.A. 1247.

The day after Billioni watched the press conference, he reported to work. In a practice other officers described as routine, Billioni and another officer reviewed the video of Grose's death. What Billioni saw on the video departed drastically from Faris's recounting of events. Billioni "saw a struggle with [Grose] that turned into James Moore

16

punching [Grose] 12 times." J.A. 214. He observed officers repeatedly using a taser on Grose. And he watched officers use flex cuffs on the football helmet restraining Grose—a dangerous practice he had not previously seen because if the cuffs were tightened down too much, they could have cut off Grose's airway.

Though against policy, Billioni discussed the discrepancies between the video and Faris's statement with his wife, an employee of a local television station. Her disclosure of the information to another reporter ultimately led to an internal investigation within YCSO and Billioni's termination. Notably, four other officers—including Chief Arwood, Chief Martin, and Sheriff Bryant—spoke to their wives about the events and were not disciplined for violating YCSO policy.

I relay these facts because the majority believes "Billioni's interest in conveying the speech in question should be afforded diminished weight in balancing because it was not 'a particularly informed opinion' in many respects." Majority Op. at 11 (quoting *Crouse*, 848 F.3d at 586). To the contrary, I am persuaded that Billioni had sufficient knowledge to support his speech. Unlike in *Crouse*, Billioni watched a public press conference during which an officer affirmatively stated there was no misconduct surrounding Grose's death. Billioni then compared the substance of the officer's remarks with *actual recorded footage* of the incident. *Cf. Crouse*, 848 F.3d at 581, 586 (noting that the terminated officer "did not witness the alleged use of excessive force" and relied on an incident report and photographs alone).

As the district court properly summarized, "Plaintiff's interest in his speech is a public concern because it involved alleged misconduct by correctional officers in a

17

situation wherein an inmate died while in the custody of the YCSO." J.A. 1575 (cleaned up); *see also Brawner v. City of Richardson*, 855 F.2d 187, 191–92 (5th Cir. 1988) ("The disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department."). I would afford substantial weight to reports of alleged police misconduct, especially in instances in which a department has affirmatively and publicly denied wrongdoing.

With this heightened interest in speaking freely in mind, I consider the government's interest in "providing efficient services." *Crouse*, 848 F.3d at 582. As YCSO argues, Billioni's failure to comply with its policy required the department to "divert resources to investigate the source of information conflicting with reports coming from" the SLED investigators. J.A. 1573. Beyond that, there is no evidence that Billioni's speech negatively affected discipline at the YCSO detention center, diminished workplace morale, or prevented Billioni from doing his job. Rather, YCSO puts forth generalized fears about unauthorized disclosures of confidential information, suggesting that such disclosures are detrimental to its operations and undermine public confidence in the department.

I agree with the majority that the district court applied the appropriate standard on remand: YCSO was not required "to prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was 'reasonably to be apprehended.'" *Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992) (quoting *Jurgensen v. Fairfax County*, 745 F.2d 868, 879 (4th Cir. 1984)). But I would afford less weight to this disruption, particularly in light of the facts of this case. True, we allow law enforcement

18

departments to impose greater restrictions on speech given the potential harm of disclosing information about an ongoing investigation. *See Brickey*, 828 F.3d at 304; *Maciariello*, 973 F.2d at 300. We nonetheless afford less weight to "lip service to ostensible damage to [department] morale, relationships between colleagues, and the function of the [department] generally." *See Durham v. Jones*, 737 F.3d 291, 302 (4th Cir. 2013). To my mind, YCSO's reasonable apprehension of disruption is not nearly enough to overcome Billioni's significant interesting in speaking about alleged police misconduct.

## II.

As the majority aptly notes, in these circumstances, "particularized balancing is difficult." Majority Op. at 8–9 (quoting *Connick v. Myers*, 461 U.S. 138, 150 (1983)). But "[s]erious, to say nothing of corrupt, law enforcement misconduct is a substantial concern that must be met with a similarly substantial disruption in the calibration of the controlling balancing test." *Durham*, 737 F.3d at 302. I would hold that Billioni's interest in warning of potential police misconduct and corruption surpasses YCSO's interest in efficiency. I would accordingly reverse the district court's grant of summary judgment.